MILSEN COMPANY, a corporation, et al., Plaintiffs-Appellants,

v.

The SOUTHLAND CORPORATION, a corporation, et al., Defendants-Appellees.

No. 71-1413.

United States Court of Appeals, Seventh Circuit.

Dec. 13, 1971.

Rehearing Denied Jan. 25, 1972.

Barbara B. Hirsch, Chicago, Ill., for plaintiffs-appellants.

Kenneth J. Glick, Libertyville, Ill., for intervenor.

G. Duane Vieth, Washington, D. C., Earl E. Pollock, Donald E. Egan, Chicago, Ill., for defendants-appellees.

Before DUFFY and HASTINGS, Senior Circuit Judges, and SPRECHER, Circuit Judge.

SPRECHER, Circuit Judge.

This is an appeal from the trial court's denial of a preliminary injunction against termination of franchise agreements pending the trial of an antitrust suit against the franchisor.[1]

Plaintiffs operate various Open Pantry Food Marts, which are "convenience" grocery stores in the Chicago area. The Open Pantry defendants signed franchise agreements with plaintiffs at different times between December 1965 and January 1969. Defendant Southland, which sponsors a system of convenience stores under the name "7-Eleven," acquired Northern Illinois Open Pantry on November 18, 1970, and assumed control of the regional Open Pantry system. Southland bought defendant Wanzer, a dairy producer, in 1969. Defendant M. Loeb is a grocery wholesaler.

On March 8, 1971, plaintiffs filed their complaint, alleging that defendants had violated sections of the Sherman and Clayton Acts.[2] On April 15, defendants answered the complaint; Northern Illinois filed a counterclaim for franchise fees and rents allegedly in arrears. On the same day, Northern Illinois served notices of default on plaintiffs and on the owners of six other franchised stores. The notices stated that the franchise agreements would be terminated in 15 days if the outstanding fees and rents were not paid.

---

1. This court on June 11, 1971, granted plaintiffs' motion for injunction pending appeal. The order enjoined Southland and Northern Illinois Open Pantry from collecting franchise fees from plaintiffs who posted appropriate bonds.

2. 15 U.S.C. §§ 1 and 2; 15 U.S.C. §§ 13, 14 and 18.

Five days later, plaintiffs filed an emergency motion for preliminary injunction, in which they sought to enjoin defendants from terminating their franchises for failure to pay rents and franchise fees. Plaintiffs presented documentary evidence and testimony at the hearing on the motion to support their claims that defendants were guilty of antitrust violations and that the violations were effectuated by the franchise fees defendants sought to collect from the plaintiffs.

Plaintiffs alleged and offered evidence to prove the following violations:

1. Combining to restrain trade through tie-ins and price fixing (15 U.S.C. § 1). The franchise agreement requires the store owner to stock items designated and in quantities specified by the franchisor. The franchisor's agreement to replace stock which is not sold in a reasonable time does not apply to items not recommended by the franchisor. In another clause of the agreement, the store owner agrees to sell only those products which are approved by the franchisor's merchandising service. He agrees to buy equipment under the direction of the franchisor. The plaintiffs who took the stand testified that Open Pantry required them to buy groceries from defendant M. Loeb, to buy dairy products from defendant Wanzer, and to enter into leases and insurance and loan agreements with Open Pantry or companies designated by it.

The franchise agreement states that Open Pantry will not replace merchandise marked at a price higher than its recommended maximum price. The "Store Owners' Manual" is more explicit: "The maximum retail price of all merchandise sold will be established by the regional office."

Reprisals for failure to follow Open Pantry's "recommendations" came in the form of letters or telephone calls. Open Pantry officers warned plaintiffs to bring their pricing and merchandising practices into line or risk losing their franchises.

2. Attempting to monopolize the wholesale and retail grocery businesses through the above practices (15 U.S.C. § 2).

3. Requiring the store owners not to buy goods from competitors of the designated suppliers (15 U.S.C. § 14). The basis for this alleged violation is described above. In addition, Open Pantry forbade the store owners to display merchandise, set up in-store promotions or talk to salesmen from food distributors except when authorized by the franchisor.

4. Acquiring corporations with the effect of lessening competition (15 U.S.C. § 18). Southland offered Open Pantry store owners inducements to convert their store to the "7-Eleven" chain, also owned by Southland. In some instances plaintiffs' primary competitors were 7-Eleven stores. Also, Open Pantry required its franchisees to buy their dairy products from another Southland subsidiary, Wanzer & Sons.

Plaintiffs also alleged but did not attempt to prove discrimination in prices, discounts and services (15 U.S.C. §§ 13 and 13a).

■ There is little doubt that plaintiffs have established at least a prima facie case of antitrust violations under the four categories enumerated above. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969) (tying prefabricated houses to loans); F T C v. Texaco, Inc., 393 U.S. 223, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968) (tying leases and gasoline contracts to tires, batteries and accessories); Siegel v. Chicken Delight, Inc., 311 F.Supp. 847 (N.D.Cal.1970), aff'd except on damages issue, 448 F.2d 43 (9th Cir. 1971) (tying trademarks to supplies). Price-fixing violations were found in Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); and United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). The *Brown Shoe*

cases are examples of exclusive dealing in violation of 15 U.S.C. § 14 (F T C v. Brown Shoe Co., 384 U.S. 316, 86 S.Ct. 1501, 16 L.Ed.2d 587 (1966)), and vertical and horizontal mergers which lessen competition (Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L. Ed.2d 510 (1962)).

Under the district judge's view of the case, he did not need to (and did not) make any finding on whether antitrust violations were shown. It is necessary for us to review the record and the law to determine the probability of plaintiffs' success on the merits,[3] to evaluate the equities between the parties, and to provide a background for considering the relationship between the alleged antitrust violations and the threatened terminations of the franchise agreements.

Many courts have held that defendants who are or may be guilty of anticompetitive practices should not be permitted to terminate franchises, leases or sales contracts when such terminations would effectuate those practices.[4] Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970); Sahm v. V-1 Oil Co., 402 F.2d 69 (10th Cir. 1968); Broussard v. Socony Mobil Oil Co., 350 F.2d 346 (5th Cir. 1965); Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3d Cir. 1962); Bateman v. Ford Motor Co., 302 F.2d 63 (3d Cir. 1962); Interphoto Corp. v. Minolta Corp., 295 F.Supp. 711 (S.D.N.Y.), aff'd, 417 F.2d 621 (2d Cir. 1969); Wurzberg Brothers, Inc. v. Head Ski Co., 276 F. Supp. 142 (D.N.J.1967); Madsen v. Chrysler Corp., 261 F.Supp. 488 (N.D.

Ill.1966), vacated as moot, 375 F.2d 773 (7th Cir. 1967); McKesson and Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa.1964).[5]

The most common situation is a suit by an automobile dealer under the "Dealer's Day in Court Act," [6] which provides for damages only. In reversing the denial of a preliminary injunction against termination of one such dealership, the Third Circuit Court of Appeals said: "A judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who . . . has had a . . . franchise since 1933." *Bateman, supra,* 302 F.2d at 66. The Second Circuit expressed a similar sentiment in *Semmes, supra,* 429 F.2d at 1205: "[Franchisees] want to sell automobiles, not to live on the income from a damages award." These cases recognize the vested interest a franchisee builds in his business through years of effort and expenditure, as noted by this court in Beloit Culligan Soft Water Service, Inc. v. Culligan, Inc., 274 F.2d 29, 34 (7th Cir. 1959).

Courts which have entered injunctions against terminations have weighed the equities and found the plaintiffs' side more substantial, even though in each case the plaintiff had violated the terms of the franchise or sales agreement and had given defendant a contractual basis for termination. The public interest in encouraging antitrust prosecutions by private parties (Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231

---

3. Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970), suggests in a similar case that because of the imbalance of hardship, a plaintiff need not show a likelihood of success. A temporary injunction should be granted if the questions raise "a fair ground for litigation." 429 F.2d at 1205–06. Under either standard, plaintiffs in this case have met their burden.

4. *See also* Wilson, "An Emerging Enforcement Policy for Franchising," 15 New York Law Forum 1 (1969).

5. *Contra,* Miller Plymouth Center, Inc. v. Chrysler Motors Corp., 286 F.Supp. 529 (D.Mass.1968). The court appeared to conclude that money damages would be proper and adequate relief because the court could not order the parties to continue their relationship indefinitely. But the court could nevertheless have enjoined termination for anticompetitive purposes.

6. 15 U.S.C. § 1222.

(1968)) and the need for such parties to continue in their businesses while the legal claims are tried have persuaded courts to restrain terminations pendente lite.

■ The Open Pantry store owners have presented an appropriate case for preliminary injunction. They have fulfilled the requirements stated recently in American Family Life Assurance Co. v. Aetna Life Ins. Co., 446 F.2d 1178, 1180 (5th Cir. 1971): (1) plaintiffs have no adequate remedy at law and will be irreparably harmed if the injunction does not issue, because they will lose their stores and may not be able to finance the trial on their legal claims if they lose their businesses now; (2) the balance of hardships tilts toward plaintiffs, because defendants risk little in allowing plaintiffs to continue operating their stores; and (3) plaintiffs have at least a reasonable likelihood of success on the merits, because they have proved on a prima facie basis a number of serious antitrust violations.

Despite the persuasive factual situation and the legal precedents outlined above, the district judge denied the preliminary injunction because he deemed controlling a line of cases exemplified by Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). He found that defendants desired to terminate the franchises because plaintiffs' franchise fees and rents were in arrears, and that the franchisor had no other motive. He correctly concluded from the *Kelly* cases that charges of antitrust violations cannot be a defense to a breach-of-contract suit. Therefore he found that the franchise fees and rents were legitimate debts which plaintiffs had to pay or forfeit their franchises.

The *Kelly* cases, however, are all instances of a buyer receiving goods and reselling them. When the original seller sued or counterclaimed for the price of the goods, the buyer defended on grounds that the seller was guilty of antitrust violations. The earliest case is Bruce's Juices, Inc. v. American Can

Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L. Ed. 1219 (1947). The buyer's defense was that the seller had given illegal quantity discounts to other buyers. Because the sale to defendant was legal, the Court could find a violation of the Robinson-Patman Act only by looking at other sales. The Court enforced the sales contract and said: "The Court does not give its approval to transactions between one of the litigants and a third party just because it holds them irrelevant to this litigation." 330 U.S. at 756, 67 S.Ct. at 1021.

In Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), defendant (an onion grower) bought 50 carloads of onions at a fair price. The defendant alleged that plaintiff (another onion dealer) had coerced him and others into buying the onions to prevent plaintiff from dumping 600 carloads of onions on the futures market. The Court held for the plaintiff because, again, it could enforce the sales contract without enforcing the precise conduct made illegal by the antitrust statutes. Shoaf v. Triangle Publications, Inc., 43 F.R.D. 10 (E.D.Pa.1967), followed *Kelly* in awarding a counterclaim to the seller of newspapers, where the defense was that the seller's resale price maintenance policy violated the Sherman Act.

These cases do not control the Open Pantry situation for the following reasons:

1. Plaintiffs did not owe franchise fees for goods which they resold. The rationale of the *Kelly* cases does apply to rent, however, since plaintiffs used the premises leased to them by Open Pantry. The interlocutory order of this court required plaintiffs to keep rent payments current as a condition for continuing their franchises.

2. What plaintiffs did receive in exchange for the franchise fees (merchandising, bookkeeping and advertising services) were services designed to effectuate defendants' scheme. The franchise-fee arrangement financed Open Pantry's alleged antitrust violations.

Defendants, more than plaintiffs, benefited from the franchisor's services.

3. Buyers in the other cases did not risk losing their businesses by refusing to pay their debts; all that was at stake was a possible loss of profit. Plaintiffs here will lose their stores if they refuse to cooperate with defendants' anticompetitive practices.

4. Most important, if a court allows defendants to collect the franchise fees or terminate the franchises, it must in effect approve the possible antitrust violations. Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909), limited in Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915); and Farbenfabriken Bayer, A. G. v. Sterling Drug, Inc., 307 F.2d 207 (3d Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed. 2d 733 (1963).

The district judge's reliance on the *Kelly* cases led him to a finding that there was no connection between the franchise fees and the antitrust violations. Since those cases are not controlling upon this record, that finding was clearly in error.

Open Pantry charged its franchisees 3½ to 4 percent of gross sales for the very "services" which permitted Open Pantry to enforce its alleged policies of fixing prices, limiting product competition and tying equipment and services. Southland attempted to use the franchise fees to persuade some plaintiffs to convert their stores to the 7-Eleven system, by offering to refinance the debt at 1 percent interest if they converted.

Even more convincing evidence of the connection between the franchise fees and the antitrust violations is the arrangement for selling dairy products. Open Pantry required its franchisees to buy and resell dairy products from defendant Wanzer, and from no other dairy. Wanzer's price for a gallon of milk was as much as 32 cents higher than other brands. The resale price dictated by Open Pantry was higher than resale prices for other brands, but so low in comparison with the wholesale price that plaintiffs lost as much as 9 cents on each sale of a gallon of milk. Various plaintiffs testified that the high Wanzer prices jeopardized their competitive positions against other grocery stores. Since dairy products constituted 15 to 20 percent of the volume in their stores and were a primary attraction to get customers into the convenience groceries, business as a whole suffered.[7] Declining sales made it difficult for plaintiffs to pay their franchise fees.

The franchisor promoted Wanzer as the exclusive supplier of dairy products because Wanzer rebated 14 percent of Open Pantry outlet sales proceeds to Northern Illinois Open Pantry. Supposedly, the franchisor applied these rebates against the franchise fees due from plaintiffs.[8] But the rebates were not enough to cover the monthly accumulation of franchise fees.

The franchisor then allowed the store owners to fall farther and farther behind in their payments of franchise fees. Open Pantry tried to collect fees only when a store owner began buying a different brand of dairy products or raised the resale price above the franchisor's maximum. Open Pantry's practice in effect locked plaintiffs into a situation where their franchises were safe as long as they cooperated with the franchisor's merchandising program. A single deviation brought the threat that the franchise would be terminated because of the unpaid fees. The fee-rebate system became both carrot and stick.

The inequities of this arrangement prove the wisdom of courts which

---

7. Plaintiffs were able to come to this conclusion by comparing gross sales and profits with those during the period of the milk strike in 1970, when they were allowed to buy other brands of dairy products.

8. A franchisee received no credit against his fees for purchases of other brands of dairy products.

have refused to permit a party to benefit from contractual rights when the contract is an instrument of restraint of trade. Osborn v. Sinclair Refining Co., 324 F.2d 566 (4th Cir. 1963); Wurzberg Brothers, Inc. v. Head Ski Co., 276 F. Supp. 142 (D.N.J.1967). If the agreement violates antitrust laws, "it follows that the reasons for defendant's refusal to renew [or termination of] the plaintiff's franchise become immaterial and irrelevant." *Wurzberg, supra* at 146.

■■ We recognize the general rule that a reviewing court will reverse the grant or denial of an interlocutory injunction only where the district court's order abuses its discretion. But "where it is plain that the disposition was in substantial measure a result of the lower court's view of the law, which is inextricably bound up in the controversy, the appellate court can, and should review such conclusions." Societe Comptoir etc. v. Alexander's Dept. Stores, Inc., 299 F. 2d 33 (2d Cir. 1962).[9] Where the lower court's conclusions and applications of law are erroneous, as we have found here, even the denial of a preliminary injunction should be reversed if necessary to protect the parties' rights. Ring v. Spina, 148 F.2d 647 (2d Cir. 1945); *see also* Bateman v. Ford Motor Co., 302 F.2d 63 (3d Cir. 1962); Perry v. Perry, 88 U.S.App.D.C. 337, 190 F.2d 601 (D. C.Cir. 1951).

We therefore reverse and remand to the district court for entry of a preliminary injunction and trial on the merits. The order should substantially follow this court's order of June 11 in granting relief against defendants Southland and Northern Illinois Open Pantry, conditional upon the continuance of the bonds posted under that order and the order of June 21. Plaintiffs should continue to pay rent for their stores. The district court may also consider enjoining termination of the franchises of all plaintiffs rather than the collection of franchise fees, since termination was the evil against which plaintiffs' motion was directed.

■ Plaintiffs state in their brief that Northern Illinois took possession of two stores on August 2, 1971, after their owners failed to post the bonds required by our June 11 order. These plaintiffs (Mr. and Mrs. Sipek and #70 OPFM) now seek a preliminary injunction restoring the two groceries to their ownership.

Northern Illinois took this ejectment action in the midst of the appeal at its own risk. But we believe the trial on the merits is the more appropriate forum for a determination of whether the risk was a permanent injunction returning the stores to the plaintiffs' possession, or treble damages for their losses. See Ramsburg v. American Investment Co., 231 F.2d 333 (7th Cir. 1956).[10]

Certain plaintiffs also ask us to return franchise fees paid to defendants during the lawsuit to prevent termination of their franchises. This is another subject better reserved for the trial court's initial determination. The preliminary injunction will protect these plaintiffs from improper termination of their franchises, which is all they are entitled to at this preliminary stage of the proceedings.

Our opinion does not compel a holding that plaintiffs owe no franchise or other fees to defendants. Siegel v. Chicken Delight, Inc., 311 F.Supp. 847 (N.D.Cal. 1970), did not allow as an offset against damages a reasonable value for the Chicken Delight license or the value of the tied products. The Ninth Circuit remanded the case for a limited trial on the damages issue and said: "To ascertain whether an unlawful arrangement for the sale of products has caused inju-

9. Misapplication of the law to particular facts is itself an abuse of discretion. United States v. Beaty, 288 F.2d 653 (6th Cir. 1961); Clemons v. Board of Education, 228 F.2d 853 (6th Cir.), cert.

denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956).

10. The *Ramsburg* case was settled following the 1956 opinion denying the motion to dismiss the appeal.

ry to the purchaser, the cost or value of the products involved, free from the unlawful arrangement, must first be ascertained." 448 F.2d 43, 52 (9th Cir. 1971). If the district court finds plaintiffs entitled to treble damages, it should award defendants an offset of the reasonable value of services which benefited plaintiffs and were not bound up with any illegal practices by defendants.

Reversed and remanded for further proceedings consistent with this opinion.[11]

11. Defendants Open Pantry Food Marts and Open Pantry Development Corp. challenge the district court's jurisdiction under the antitrust statutes. They claim plaintiffs have shown no effect on interstate commerce. Their objection is untenable, according to similar cases involving antitrust complaints against national franchises. Siegel v. Chicken Delight, Inc., 311 F.Supp. 847 at 850 (N.D.Cal. 1970), aff'd except on damages issue, 448 F.2d 43 (9th Cir. 1971); Susser v. Carvel Corp., 206 F.Supp. 636 at 651 (S.D.N.Y.1962), aff'd, 332 F.2d 505 (2d Cir.), cert. granted, 379 U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

The Open Pantry system has stores in at least 15 states. It provides its franchisees with advertising and promotional services from its national office. Franchisees must pay a 1 percent fee for these services and another 1 percent for use of the national trademark. The Open Pantry stores supposedly carry more than 3,000 nationally advertised products which the store owners buy from interstate distributors.

Defendants rely primarily on two cases of local price wars, where the courts found no effect on interstate commerce. Uniform Oil Co. v. Phillips Petroleum Co., 400 F.2d 267 (9th Cir. 1968); Atlantic Co. v. Citizens Ice & Cold Storage Co., 178 F.2d 453 (5th Cir. 1949), cert. denied, 339 U.S. 953, 70 S.Ct. 841, 94 L.Ed. 1365 (1950). But those cases appear to conflict with the Supreme Court's holding in Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954).