John T. PHILLIPS, Jr., Plaintiff,

v.

CROWN CENTRAL PETROLEUM
CORPORATION, Defendant.

Corrado Frank TUMMINELLO,
Plaintiff,

v.

CROWN CENTRAL PETROLEUM
CORPORATION, Defendant.

Charles Phillip FREITAG, Plaintiff,

v.

CROWN CENTRAL PETROLEUM
CORPORATION, Defendant.

Carroll Charles MYERS, Plaintiff,

v.

CROWN CENTRAL PETROLEUM
CORPORATION, Defendant.

Civ. Nos. 73–303–H, 73–304–H, 73–504–H
and 73–506–H.

United States District Court,
D. Maryland.
Sept. 20, 1973.

Robert G. Levy and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiffs.

James H. Kelley and Bergson, Borkland, Margolis & Adler, Washington, D. C., and Morton A. Sacks and Cable, McDaniel, Bowie & Bond, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

ALEXANDER HARVEY, II, District Judge:

Each plaintiff in these four cases is an independent gasoline service station dealer operating a station leased from defendant, Crown Central Petroleum Corporation. Each plaintiff has filed a separate action herein, seeking treble damages from defendant and injunctive relief under the Clayton and Sherman Acts. Presently before the Court is a combined motion filed in each case for a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, seeking to enjoin the defendant and its agents and representatives from terminating or threatening to terminate, or not renewing or threatening not to renew, the Leases and Dealer and Equipment Loan Contracts entered into between the parties, pending the final determination of the antitrust actions. Other injunctive relief is also sought, but the basic issue now before the Court is whether plaintiffs' leases shall be continued or renewed during the pendency of these actions, or whether such leases shall be permitted to expire under their terms, with other lessees presumably occupying the stations in question while these actions continue.

Defendant Crown Central Petroleum Corporation, a Maryland corporation, is a large refiner and marketer of petroleum, although not in the same class as giants like Texaco, Gulf and Exxon. To compete with these giants, Crown, during the late 1960's, changed its retail outlets from conventional service stations to so-called multi-pump operations selling at discount prices. During the same period, it converted from Company owned and operated stations to stations leased to and operated by independent dealers such as the plaintiffs. Crown currently has approximately 30 multi-pump stations in the Baltimore marketing area.

Plaintiff Phillips has been a Crown service station dealer since December 21, 1970 and has been at his present location on Ritchie Highway since January 25, 1971, principally under one-year leases. On January 9, 1973, he was given a new six-month "probationary" Lease and Dealer and Equipment Loan Contract. On April 3, 1973, he filed an antitrust action in this Court, alleging that the defendant Crown had violated Section 1 of the Sherman Act, 15 U.S.C. § 1. In the three Counts of his complaint, plaintiff Phillips alleges (1) a horizontal conspiracy between defendant and certain of its competitors to fix and maintain wholesale and retail gasoline prices and

retail motor oil prices in the Baltimore area, (2) an illegal vertical undertaking by defendant to fix plaintiff's gas and oil retail prices and (3) an unlawful agreement or combination to prevent Phillips and other Crown dealers from obtaining motor oils, antifreeze, vending machines and vending machine supplies from sources other than Crown or from suppliers other than those designated by Crown. On May 5, 1973, some one month after suit was filed, Crown notified Phillips that his lease and contract would not be renewed. By agreement of counsel, the expiration date was continued to September 9, 1973.

Plaintiff Tumminello commenced operations as a Crown dealer on March 9, 1969 at his Belair Road service station, under the usual one-year lease given to similar station operators. Prior to that, he had served since 1964 as a Crown Sales Representative. Following successive renewals of his one-year leases, in March 1973, he was given a six-month "probationary" Lease and Dealer and Equipment Loan Contract. On April 3, 1973, he too filed an antitrust suit in this Court against Crown which contained allegations almost identical with those in the suit filed by Phillips. On May 5, 1973, he too was notified that his lease and contract would be allowed to expire on September 9, 1973.

Plaintiff Freitag has been a Crown dealer since November 25, 1970, after serving as a manager of his Harford Road station for about a month while it was operated by Crown. On May 25, 1973, he filed in this Court an antitrust suit against Crown which contained allegations almost identical with those in the suit filed by Phillips. On or about August 1, 1973, Freitag was notified that his lease and contract would be allowed to expire on November 25, 1973.

Plaintiff Myers, the fourth plaintiff, has been a Crown dealer at his present station at Old Stage and Quarterfield Roads since August 18, 1970. On May 25, 1973, he filed an antitrust suit in this Court against Crown which con-tained allegations almost identical with those in the suit filed by Phillips. On June 28, 1973, Crown offered Myers a one-year renewal if he would sign Crown's new Lease and Dealer Agreement. Myers duly executed the Agreement and returned it to Crown, but he specifically reserved the right to challenge in his suit several provisions in this revised contract and lease. For this reason, Crown declined to accept the executed papers. Myers' lease has been extended by agreement to September 9, 1973. At a status conference held in these four cases on August 14, 1973 (and it should be noted that the same attorneys represent all four plaintiffs in these actions), plaintiffs' counsel advised the Court that three of the leases would expire September 9, 1973 and the fourth on November 25, 1973, and that plaintiffs would shortly be filing a combined motion for a preliminary injunction to prevent expiration of the leases during the pending litigation. Plaintiffs requested an immediate evidentiary hearing on the motion, which counsel estimated would last some five or six days.

At such conference, counsel were advised that the Court's schedule would not permit the holding of a lengthy evidentiary hearing before September 9, 1973. Counsel were accordingly invited to file briefs and affidavits in support of and in opposition to plaintiffs' motion for a preliminary injunction, whereupon the Court would schedule a hearing on the motion as soon as possible. Extensive briefs and voluminous affidavits, exhibits and excerpts from depositions have now been filed by both sides. Full argument was heard on the matter, and in view of the urgency of the situation, the Court agreed to rule on the motion immediately. Defendant's counsel have agreed to extend the existing leases until the Court has rendered a decision on the motion. Findings of fact and conclusions of law are contained in this Opinion.

The complaints in these cases raise many different factual and legal anti-

trust questions, including claims of horizontal price fixing, vertical price fixing and tying agreements. But it is not necessary in deciding this motion for the Court to concern itself with all the allegations in the complaints and all the denials in the answers, with reference to alleged violations of the antitrust laws by defendant. The only question presently before the Court is whether the relationship between plaintiffs and defendant which existed at the time suit was filed should be continued during the time it takes to have these cases finally tried to a decision.

Plaintiffs claim that their leases are not being renewed because they have refused to comply with illegal directives from defendant to raise and lower prices as and when required by defendant and to use motor oils, antifreeze and vending machines designated by defendant. In particular, plaintiffs point out that they received notices to terminate their leases only after these actions had been filed, charging defendant with various antitrust violations.

Defendant Crown on the other hand claims that plaintiffs' leases are not being renewed because of legitimate business reasons, namely because plaintiffs have failed to maintain proper standards and an adequate cooperative spirit enabling them to compete effectively. Crown argues that plaintiffs saw the handwriting on the wall and, claiming violations of antitrust law that were manufactured, filed suit in anticipation of the termination of their relationship with Crown so as to be able to enlist the injunctive powers of this Court to continue leases which Crown legally had the right to discontinue.

■ The decision to issue a preliminary injunction is discretionary with the Court. As was said by the Fourth Circuit, the factors to be considered by a district judge have long been settled in this Circuit and are stated in West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232, 235 (4th Cir. 1971), as follows:

"'[I]t is sufficient if the court is satisfied that there is a probable right and a probable danger and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant * * *'"

quoting from Sinclair Refining Co. v. Midland Oil Co., 55 F.2d 42, 45 (4th Cir. 1932). Other Fourth Circuit cases have indicated that the inquiry must also determine whether plaintiff will suffer irreparable injury if the injunction is not issued. Long v. Robinson, 432 F.2d 977 (4th Cir. 1970).

■ Initially, the question is raised in the present case whether a motion for a preliminary injunction can be granted or denied without an evidentiary hearing, particularly where there are conflicting affidavits. See S.E.C. v. Frank, 388 F.2d 486 (2d Cir. 1968). However, it has been held that once a party joins "the battle of the affidavits", he has consented to a decision based on them and cannot complain about the result if he is the loser. Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970). This principle was reaffirmed in a later Second Circuit case. Dopp v. Franklin National Bank, 461 F. 2d 873 (2d Cir. 1972). In Johnston v. J. P. Stevens & Co., 341 F.2d 891 (4th Cir. 1965), the Fourth Circuit approved the district court's decision on a motion for a preliminary injunction, where there was an "apparent consensus" of the attorneys to accept the judge's request to try the motion on affidavits.

■■ Here, both parties, at the invitation of the Court and in view of the urgent pressures of time presented by the motion, joined in the battle of the affidavits. In the period of about a month since the motion was filed, both sides have provided the Court with an extensive factual record by way of affi-

davits, documents and excerpts from depositions. Undoubtedly, there are some conflicts in the affidavits which can be resolved only by an evidentiary hearing. But there are enough essential facts about which there is little dispute for the Court to reach the necessary inferences for a decision here. Although plaintiff has the burden here, it is clear that a plaintiff need establish only a probable right to satisfy the first part of the test to be applied. See West Virginia Highlands Conservancy v. Island Creek Coal Co., *supra*.

█ In reviewing this record, the Court would note that there are numerous conflicts between affidavits executed by the plaintiffs themselves and affidavits executed by employees or representatives of defendants. Merely because this motion has been heard on affidavits, the Court is not foreclosed from evaluating the sworn statements in light of the overall record. See Bowers v. Columbia General Corp., 336 F.Supp. 609, 613 (D.Del.1971). In making the findings contained in this Opinion, this Court has relied on uncontradicted statements of fact or on facts established by the affidavits of those who are not parties and who have no interest to advance. See Burlington Mills Corp. v. Roy Fabrics, 91 F.Supp. 39 (S.D.N.Y.), aff'd per curiam, 182 F.2d 1020 (2d Cir. 1950). Except for the affidavit of Horner, who, in spite of his status as a present dealer of Crown, has supported some of plaintiffs' contentions, I have not considered defendant's present dealers to be non-party affiants, as they quite clearly could not be expected to take a position which might be injurious to their present business relationship with Crown.

It should further be noted that the findings in this Opinion have been made on the basis of the record presently before the Court and relate solely to the pending motion for a preliminary injunction. The right is reserved to all parties to relitigate fully at trial all facts found herein.

The significant facts are as follows:

1. With reference to plaintiff Tumminello, this Court finds that he was a "good dealer"; that he pumped an adequate amount of gas monthly and that his station was reasonably clean, neat and well-staffed, even though he had disagreements from time to time with Crown's field personnel. He was recommended for renewal by Crown's sales representative Donald Head, but was given only a six-month "probationary" lease last March.

2. With reference to plaintiff Phillips, it appears that Phillips received some minor complaints from Crown field personnel. However, many inspection reports give his station an overall rating of "good" or better, and sales representative Donald Head considered his performance to be "satisfactory" as of March of 1973. Phillips stocked Quaker State Motor Oil beginning late in 1972, and in January 1973, he was given a six-month "probationary" lease ending July 25, 1973.

3. Although plaintiff Freitag has received a few poor inspection reports in the past, nevertheless his station has been given several community awards for landscaping and appearance. Freitag had likewise been recommended for renewal by Donald Head before November 1972, and this recommendation had been accepted by Crown when Freitag was given his last one-year lease.

4. The performance of plaintiff Myers was concededly found to be satisfactory by defendant, and he was given the opportunity in June 1973 to sign the new Lease and Dealer Agreement and continue in his station. Myers executed the contract, but, because it contained many new provisions, he reserved the right to challenge in this suit any practices he found objectionable, even if they had now been formalized in the lease. Crown found this reservation of rights "unacceptable" and has refused to accept the executed contract.

5. Each of the plaintiffs has significantly increased the amount of gasoline pumped at his station during his time as

a Crown dealer. Tumminello has increased his sales from 68,904 gallons of gasoline in March 1969 to approximately 184,000 gallons in July 1973. Phillips has increased his sales of gasoline from 82,886 gallons in February 1971 to approximately 233,000 gallons for the month of July 1973. Myers has increased his sales of gasoline from 83,338 gallons in September 1970 to approximately 160,500 gallons in June 1973. Freitag has increased his sales of gasoline from 92,156 gallons in March 1971 to approximately 245,300 gallons in July 1973.

6. According to non-party affiants, plaintiffs Tumminello, Freitag and Phillips, and employees of each of these plaintiffs, were told by various Crown personnel that they were to change their retail prices at particular times by particular amounts. Tumminello was also told by Donald Head that he would not be permitted to change his prices without Crown's permission.

7. David Horner is a Crown dealer at the present time. Until the end of 1972, Crown told him when to change his retail prices. Since then, Crown has informed him only of the wholesale price and recommended a retail price to be charged. However, on August 23, 1973, Horner's sales representative told him his wholesale price was being reduced and recommended a retail price decrease. Horner did not reduce prices that day or the next, and he shortly thereafter received a call from district manager Gillespie, a visit from the president of Crown, and his first unsatisfactory inspection report. Horner lowered his prices on August 27, 1973.

8. Robert Elliott, Robert B. Garrett, Jr. and Margaret E. Kling are former Crown dealers. During their dealerships, Crown personnel told them when they were to change their prices.

9. In January 1973, Crown began a so-called "promotion" designed to require its dealers to post uniform prices for Crown motor oil because customers had complained about variations. The promotion prices were below what many dealers had been charging and followed shortly after a rise in the wholesale price that the dealers were paying for their Crown motor oil. Plaintiffs Tumminello and Phillips refused to go along with this promotion, as did a few of the other twenty-three-odd Crown dealers who gave affidavits in support of the defendant's position. Plaintiffs Freitag and Myers went along with the promotion reluctantly. Tumminello, Freitag and Myers were all informed by Donald Head that a list of non-participating dealers would be sent to Crown's main office. He referred to this as a "blacklist" in his conversation with Tumminello. In none of the excerpts of Head's deposition supplied to the Court is there any denial by Head of these facts which have been established by plaintiffs' affidavits.

10. Crown has had a cigarette promotion for the past several years. Cigarette prices are purposely set low so as to attract customers to the station and thereby increase sales of gasoline. The vending machines for this promotion are provided by Austin Fine. All dealers have in the past participated in this promotion.

11. The 1973 Lease and Dealer Agreement has effected a change in the relationship between Fine and Crown's independent dealers. Under the new contract between Crown and Austin Fine, Fine has the "sole exclusive right to place, maintain and operate" these machines upon the premises of Crown service stations. Austin Fine will stock these machines and pay Crown one cent per pack of cigarettes. This commission will then be applied against the dealer's rent under the new Lease and Dealer Agreement.

12. Most Crown dealers have soda vending machines provided by Austin Fine. All four plaintiffs used Austin Fine machines at the time these suits were filed. Myers had replaced his Coca Cola machine with an Austin Fine machine in early 1972. Phillips cancelled a contract with Valu-Vend and instead installed a soda machine from Austin Fine during the early summer of 1971, and

Tumminello did the same. Under the new Lease and Dealer Agreement and the Contract between Crown and Austin Fine to which it refers, Austin Fine has the sole and exclusive right to operate all vending machines in Crown stations.

13. Crown has required its dealers to carry only Prestone, or later Prestone and Zerex, antifreeze, although there is no requirement that these products be purchased from Crown. Under the new Lease and Dealer Agreement, all dealers are required to stock and sell these brands of antifreeze.

■ These facts indicate to the Court that plaintiffs at trial would probably be able to establish that their leases were not renewed because they, the plaintiffs, objected to illegal coercive pressures brought by defendant against each of them. We start here with the fact that plaintiffs were subject to short-term leases with five-day termination provisions. Short-term leases in this particular industry are inherently coercive. See F.T.C. v. Texaco, 393 U.S. 223, 226–227, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968). In Shell Oil Co. v. F. T. C., 360 F.2d 470, 487 (5th Cir. 1966), the Court noted that a gas station operator is bound to be overawed by a large corporation that is his supplier, his banker and his landlord. It should further be noted that a new Maryland law, effective July 1, 1973, has outlawed leases of this type which require short notice periods and has required instead a 90-day notice before termination. Short-term leases such as these are an open invitation to a major marketer like Crown to achieve by indirection what is not set out in the lease agreement itself, namely the fixing of retail prices of gasoline, or the tying of the leases to other products as desired by Crown.

Next, it is clear, and Crown so concedes, that Crown would like to keep retail prices within certain ranges. Too low a retail price would lead to a price war; too high a retail price would result in fewer sales by Crown to its independent dealers. Crown thus admitteely had a strong desire to see that prices were kept within the range that it thought appropriate.

Furthermore, Crown also admits that it gave its dealers "suggested" retail prices to be charged. Faced with short-term leases and having built up good will over a period of years, an independent dealer would not have to be confronted with very much outside pressure to be required to conform to what Crown wanted, rather than setting a price that he might independently think appropriate under existing market conditions. A few words or a veiled threat would be enough to make him toe the line. The facts here indicate the existence of such pressure which would convert a suggested price into a required price. See Lehrman v. Gulf Oil Corp., 464 F.2d 26, 37–41 (5th Cir. 1972).

Next, it is clear that plaintiffs, as contrasted with most other dealers of Crown who have filed affidavits in this case, wished to be independent in their pricing policies or in their selling or stocking of some of the few other products besides gasoline that were sold at their stations. For example, Phillips ran into trouble with Crown after he started to carry Quaker State motor oil. Defendant claims that there were poor relationships between company personnel and the plaintiffs. This is undoubtedly true, to a degree, but such relationships arose because of plaintiffs' desire to be independent of Crown's illegal pricing and other policies.

Crown argues that proper business reasons dictated the non-renewal of these leases. The record here does not support this contention. Crown was completely satisfied with Myers' performance and agreed to renew his lease. It finally declined to do so only when Myers demanded the right to challenge in this litigation some of the provisions of the new lease. Defendant was satisfied, then, with the gallonage figures of Myers, yet it should be noted that the other three plaintiffs were all in excess of Myers' figures. Indeed, the gallonage figures of both Freitag and Phillips are above the averages of all Crown dealers

in the Baltimore marketing area. Freitag has consistently been above average since December 1972. Although Tumminello is below average, he has been only slightly below in the past few years. From February 1969 to July 1973, he increased his monthly sales by over 260%. He was recommended for one-year renewal before March 1973 by Donald Head, Crown's sales representative. Yet he was not renewed. Indeed, when Head found out later that Tumminello received only a six-month lease, he said he was upset.

In the opinion of this Court, the key here is performance. These service stations are devoted primarily to large volume sales of gasoline at discount prices lower than major national companies. Were plaintiffs' standards as poor as contended by Crown, or were the relations between the parties as bad as painted by Crown, certainly performance would have been adversely affected, more so than it appears from this record. The absence of any proper business reason for discontinuing the leases suggests that the Court must look elsewhere to find why these long standing business relationships were terminated by Crown. On the record here, the clear inference is that Crown was motivated by considerations not permitted by the antitrust laws.

Because of the conflicting affidavits here and the lack of an evidentiary hearing, this is not a case where there has been a particularly strong showing by the plaintiff of the likelihood of success. But in view of the fact that the other elements necessary for relief clearly appear in this case, the showing here is enough.

The Court said in Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953):

"To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e. the balance of hardships tips decidedly toward plaintiff), it

will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation."

Plaintiffs have had their filling stations for periods of 2½ to 4 years. Were they to now lose their leases, the customer good will, their employees and the business built up in that period would be irretrievably lost. Their right to continue in business cannot be measured entirely in monetary terms. In Weingartner v. Union Oil Co., 1966 Trade Cases, Par. 71,757 (N.D.Cal. 1965), the Court found under circumstances somewhat similar to those here that a plaintiff service station dealer would suffer irreparable injury, and granted a preliminary injunction requiring renewal of his lease.

Defendant argues here that there is little good will connected with plaintiffs' operations because these are multi-pump stations. But very recently, a district court in Georgia found irreparable injury and granted a preliminary injunction even though a Hess station operator was involved. See Perry v. Amerada Hess Corp., Civil No. 18384 (N.D.Ga. June 27, 1973). As the record here indicates, Hess, like Crown, operates multi-pump, discount stations.

Defendant's arguments as to good will are somewhat inconsistent. On the one hand, defendant contends that there is little good will connected with a multi-pump station which is devoted primarily to volume sales of gasoline. Yet on the other hand, defendant argues that these plaintiffs did not maintain clean and attractive stations nor provide quick and efficient service, aspects of these operations which clearly relate to customer good will.

Other cases which support this Court's findings of irreparable injury are the following: Semmes Motors, Inc. v. Ford Motor Co., *supra*; Milsen Co. v. Southland Corp., 454 F.2d 363 (7th Cir. 1971); National Screen Service Corp. v. Poster Exchange, Inc., 305 F.2d 647

(5th Cir. 1962); Bergen Drug Co. v. Parke Davis & Co., 307 F.2d 725 (3rd Cir. 1962); Interphoto Corp. v. Minolta Corp., 295 F.Supp. 711 (S.D.N.Y.), aff'd per curiam, 417 F.2d 621 (2d Cir. 1969); and McKesson & Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa.1964).

I find unconvincing the cases cited by defendant and claimed to be contrary to those just cited.

Moreover, the balance of hardships tips decidedly in favor of the plaintiffs in this case. If the leases here are not now renewed, plaintiffs lose their very means of livelihood, with little opportunity, if they are finally successful in the future, to rehire employees or to revive the good will and business relationships established over the past few years. But if the leases are renewed, temporarily, during the pendency of this case, defendant will suffer little if any loss. Plaintiffs' sales have in the past been at least satisfactory and perhaps even better than satisfactory. Defendant can expect to continue during the pendency of this case to make wholesale sales to plaintiffs as in the past and derive the same profits therefrom as heretofore, depending of course on current economic conditions.

Finally, the issuance of a preliminary injunction in this case will do no more than maintain the status quo existing at the time suit was filed. I do not find that plaintiffs filed these suits because they were unsatisfactory dealers who desired to pressure defendant into continuing leases which would otherwise not have been extended. The finding here is that plaintiffs' performances were satisfactory and that plaintiffs had every expectation that their business relationships of several years standing with defendant would be continued. The status quo, then, is that plaintiffs would be tendered new one-year leases which would not be terminated in the absence of good cause. During the pendency of this litigation, plaintiffs are entitled to enjoy the same relationship with defendant which existed when they filed suit.

In ordering that the status quo be maintained, this Court's decree will require that plaintiffs comply with the provisions of defendant's new lease form. If there are illegal provisions in such new lease, this can be determined during the ensuing litigation. Plaintiffs should understand, of course, that the preliminary injunction signed herein does not guarantee their status as lessees under any and all circumstances. If a plaintiff breaches some provision of the new lease, or if for some other valid reason defendant would be entitled as a matter of law to discontinue any one of these leases, then defendant company could apply to the Court for a lifting of the injunction and termination of that lease. Such a right on defendant's part is no more nor less than what defendant would possess if new leases had been voluntarily executed before this litigation was commenced.

For all of those reasons, the Court will sign an Order granting the preliminary injunction.