COMMUNITY COMMUNICATIONS COMPANY, INC., a Colorado Corporation, doing business as Boulder Cable T.V., Plaintiff,

v.

CITY OF BOULDER, COLORADO, a Municipal Corporation, Boulder Communications Co., a partnership, Thomas Cross, Jack Kerner, Michael Thompson, Donald Passalaqua, Barry Telleen, and Dennis DuBe, Defendants.

Civ. A. No. 80–M–62.

United States District Court,
D. Colorado.

March 17, 1980.

Stephen M. Brett, Robert E. Youle, Dawson, Nagel, Sherman & Howard, Denver, Colo., Harold R. Farrow, Thomas A. Seaton, H. Wayne Goodroe, Megan Tootell, Farrow, Schildhause & Wilson, Oakland, Cal., for plaintiff.

Joseph N. de Raismes, Alan E. Boles, Jr., City of Boulder, Boulder, Colo., for defendant City of Boulder.

John A. Purvis, Steve C. Briggs, Hutchinson, Black, Hill, Buchanan & Cook, Boulder, Colo., for other defendants.

## MEMORANDUM OPINION AND ORDER

### MATSCH, District Judge.

The plaintiff, Community Communications Company, Inc. (CCC), moved for a preliminary injunction to prevent the City of Boulder from restricting or revoking the rights which it claims from a revocable, nonexclusive permit granted to a predecessor company in 1964. That permit was issued in the form of an ordinance enacted by the Boulder City Council, as a franchise to use public ways in that city to string cables for a community antenna system, or cable television. The geographical area involved was the entire City of Boulder and the permitted use of public ways was for a period of twenty years, with the power to terminate reserved in the following language:

> SECTION 2. That the right, permit and privilege herein granted is subject to revocation by the City Council, at its pleasure, at any time . . . (Plaintiff's Exhibit No. 22)

Under that ordinance, CCC has provided cable television service to the University Hill area of Boulder, an area comprising approximately 20% of the City's residential units and blocked off from normal reception of Denver television stations. Up to February 1980, CCC provided basically only retransmission of television signals from Denver and from one station in Cheyenne, Wyoming. In February 1980, CCC established an earth station for the reception of remote channels via satellite. The result is a greatly increased access to a variety of programming, including movies, sports, and channels from distant major cities.

Up to late 1975, cable television throughout the country was concerned primarily with retransmission of television signals to areas which did not have normal reception, with some special local weather and news services originated by the cable operators. During the late 1970's however, satellite technology impacted the industry and prompted a rapid, almost geometric rise in its growth. As earth stations became less expensive, and "Home Box Office" companies developed, the public response to cable television greatly increased the market demand for such expanded services.

The "state of the art" presently allows for more than 35 channels, including movies, sports, FM radio, and educational, children's, and religious programming. The institutional uses for cable television are fast

increasing, with technology for two-way service capability. Future potential for cable television is referred to as "blue sky", indicating that virtually unlimited technological improvements are still expected.

In May 1979, CCC wrote to the Mayor of Boulder advising her of its plans to expand cable television service to other areas of the City and to establish an earth station for satellite pick-up. To expand to new areas, CCC must contract with the public utilities for the use of their poles. Many such poles are jointly owned by the Public Service Co. and Mountain Bell Telephone Co., and a certain amount of "communications space" is left available by them for use by cable companies. The utilities grant a license to the company, under which it must make advance payments if rearrangement of the poles is necessary to make room for the cables. This "pole rearrangement" is done by the utility company, after which CCC is free to string its cables. Contracts and pole rearrangements were being negotiated by CCC from May through the end of 1979.

Shortly after CCC's letter to the Mayor, a newly formed business organization, Boulder Communications Company (BCC), codefendant herein, expressed an interest in obtaining a permit and competing with CCC. In a letter to the City Manager, BCC outlined a proposal for a new system, acknowledging the presence of CCC in Boulder but stating that "(w)hatever action the City takes in regard to TCI, it is the plan of BCC to begin building its system as soon as feasible after the City grants BCC its permit." (Plaintiff's Exhibit 9)

The Boulder City Manager and City Council reacted to this development by initiating a review and reconsideration of cable television in view of the many changes in the industry since the 1964 ordinance. Accordingly, they hired a consultant, Robert Sample, and held a number of study meetings to develop a governmental response to these changes. The primary thrust of Sample's advice was that the City should be concerned about the tendency of a cable system to become a natural monopoly. Much discussion in the City Council

centered around a supposed unfair advantage that CCC had because it was already operating in Boulder. Members of the Council, and the City Manager, expressed fears that CCC may not be the best cable operator for Boulder, but would nonetheless be the only operator because of its head start in the area. The Council wanted to create a situation in which other cable companies could make offers and not be hampered by the possibility that CCC would build out the whole area before they even arrived.

The result of this process was enactment of an "emergency" ordinance on December 19, 1979 (Ordinance No. 4473), unilaterally amending the 1964 Ordinance under which CCC had been operating, by restricting CCC from expanding its area of service for a period of three months. On the same day, the Council enacted Ordinance No. 4472, which revoked the 1964 Ordinance and reenacted it to include the same three month restriction. Both ordinances expressly stated that the purpose of this moratorium on construction was to give other cable companies an opportunity to make proposals to provide service to the City. The Boulder Council had accepted the view that such a restriction was necessary to prevent CCC from obtaining a competitive advantage by connecting up to new customers during the proposal and negotiation process. Additionally, while the Boulder Council was persuaded that it had some responsibility to regulate cable television, it had received legal advice which cast doubt upon its authority and which particularly cautioned about the possibility of violations of antitrust laws.

Apparently upon the view that any lack of regulatory authority could be finessed by the use of a contract approach, the City included the following language in Ordinance No. 4472:

SECTION 12. The grantee shall signify its acceptance of the terms hereof by continuing to provide service to any customers presently served by the grantee . . . (Plaintiff's Exhibit No. 27)

As a part of the process of soliciting applications from interested cable companies, the City drafted a proposed model ordinance and submitted it to the cable television industry with the request that those who wished to make proposals to enter the Boulder market should give their comments on that draft. The objective of the total process was to select those applications meeting the City's criteria, apparently including acceptance of regulatory powers, and then enter into a period of negotiation culminating in an agreed ordinance which could not later be attacked by the permittee.

The plaintiff claims that the revocation of its permit and the enactment of the new ordinance, with the moratorium, have adversely affected its business in ways which generate several claims for relief. The contention which is of primary importance for this motion for preliminary injunction is that the City has violated Section 1 of the Sherman Act (15 U.S.C. § 1). The plaintiff asserts that Boulder and BCC are engaged in a conspiracy to restrict competition by replacing the plaintiff with BCC. While the plaintiff has gathered some circumstantial evidence which might indicate such a conspiracy, that evidence is insufficient to establish a probability that the plaintiff will prevail on this claim.

What CCC has shown is that to influence competition Boulder unilaterally prevented further expansion of the geographical area of the plaintiff's business. Whether the intent is to promote new competition by assuring other cable companies that most of Boulder will remain available to them for possible first service, and then to permit competing companies to overbuild in the same geographical areas, or whether there is a more insidious motive to supplant CCC with a de facto monopoly, the motion for injunctive relief requires consideration of the impact on CCC. Is Boulder's action in imposing a moratorium an unlawful interference with the plaintiff's business and with free market competition?

The plaintiff concedes that it does not have an exclusive license and it recognizes that the City has the right to grant additional licenses to compete in the same geographical area. Under the present technology, more than one cable company can be on the same poles without adversely affecting the public ways. While there certainly are finite limits to overbuilding, those limits are something beyond two companies.

The City contends that its conduct here cannot be violative of the antitrust laws because it is exercising police powers and has immunity under the doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). That assertion requires an inquiry into the extent of Boulder's governmental authority. Clearly, the City has the right and responsibility to control and regulate the use of public ways. That is not disputed here. Accordingly, the City may impose such restrictions on the hanging of cables as may reasonably be necessary to protect the public and other franchise users of such property. Cable companies are entirely dependent upon their ability to use public ways for the cables necessary to transmit their programs. That obviously gives the City some leverage by controlling access to the consumer market. The scope of that leverage and the legality of its use are difficult questions.

Boulder is a home rule city under Article XX of the Colorado Constitution and claims broad regulatory power because there is a vacuum resulting from inaction by federal and state governments. Broadly stated, the people of Colorado have granted home rule cities autonomy in matters of local concern. Accordingly, though it is a municipality, the City of Boulder contends that it should be considered to have the power of state government as to such matters within its geographical area. There is no Colorado case which characterizes the operations of cable television companies as a matter of local concern. Obviously there are wider concerns, including interstate commerce, giving rise to some uncertainty about the

power of the state government in this regard, both in terms of an obstruction to interstate commerce, and with respect to the First Amendment rights of communicators.

In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Supreme Court held that both cities and states come within the reach of the proscriptions of the Sherman Act and that the immunization under *Parker v. Brown, supra*, is limited to governmental acts. In the very recent opinion deciding *California Retail Liquor Dealers Assoc. v. Midcal Aluminum Inc.*, —— U.S. ——, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court emphasized that antitrust immunity can be claimed for governmental action only when the action is taken pursuant to a clearly articulated and affirmatively expressed policy, actively supervised by the state.

■ Assuming that Boulder does have the claimed authority to regulate cable television within the City in the manner which would be required to impose all of the terms and conditions in the draft ordinance which was submitted to the plaintiff and other cable companies, the approach taken is not an appropriate exercise and articulation of a policy of regulation. It is not characteristic of utility regulation for the regulating authority to negotiate with those to be regulated and then formulate the final policy by exercising legislative power through an offer and acceptance mechanism. It might well be a different case if Boulder had enacted an ordinance articulating qualifying criteria for cable companies to do business in the City, with such other regulations as the City government might believe to be necessary and proper in the exercise of police power, and then to confront the contention that such an ordinance has an anticompetitive effect. That is not this case. Here, upon the present record, *Parker v. Brown* is wholly inapplicable and Boulder is subject to antitrust liability under *City of Lafayette v. Louisiana Power & Light, supra* for the actions which it has taken.

■ Boulder does not claim that CCC has violated any of the terms and conditions of its operating authority under the 1964 or the 1979 ordinances. The City has also conceded that while it may have the right to revoke the plaintiff's permit without cause, it may not take that action for an unlawful purpose.

What has happened up to this time in this case is not unlike those cases in which there is a unilateral refusal to deal unless certain anticompetitive conditions are met. See, *Sahm v. V–1 Oil Co.*, 402 F.2d 69 (10th Cir. 1968) and *Milsen Co. v. Southland Corp.*, 454 F.2d 363 (7th Cir. 1971). There is also a similarity with those cases in which retailers or distributors were coerced into unlawful conditions or restrictions by their suppliers, the suppliers claiming that a contractual right to terminate allowed them to cancel a previous agreement and impose new terms. *Interphoto Corp. v. Minolta*, 295 F.Supp. 711 (S.D.N.Y.1969) and *Continental Distributing Co. v. Somerset Importers*, 411 F.Supp. 754 (N.D.Ill.1976). See also, *Perma-Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Most simply stated, Boulder has attempted to restrict the lawful business of CCC by preventing it from obtaining new customers for three months while potential competitors submit proposals for serving those same customers. The motivation may be to foster competition in the long run, but the direct and immediate effect is a restraint of trade and an artificial and unreasonable geographical market allocation.

■ I am in agreement with the defendants' contention that the record does not establish any agreement or conduct which can be considered to be a per se violation of the antitrust laws. Accordingly, the rule of reason is applicable here. I disagree that the evidence shows that cable television is such a natural monopoly that

the only feasible competition is in the process of currying favor with the City Council to obtain a permit to operate. To the contrary, the evidence is that there can be competition in the marketplace, with the choice of price and service left to the consumers.

There are two other aspects of this case which are deserving of preliminary observations at this time. The plaintiff has attempted to use the shield of the First Amendment to avoid any interference from City government. That is an obvious overstatement of the law and an attempt to escape the reality that the messages it chooses to transmit must pass through a medium which is subject to some control by the City.

■ While the defendant Boulder readily concedes that the First Amendment would prohibit its control of the content of these transmissions, it does assert both the right and the responsibility for restricting the use of the public ways in this communications system. The question, of course, is what are the limits of that authority? If controlling content of the programs is beyond those limits, is it different, either in degree or in kind, for the City government to prescribe the number, variety, and scope of programming and services to be offered? And, is it appropriate for the City administration to say that the acceptability of a cable company rests on its willingness to contribute free services to that government or to such institutions or groups as may be considered to be in need of benefit or reward? Stated bluntly, may the City exact tribute for its favor?

While these questions are not now ripe for decision, they are potential problems in this developing situation. It is inappropriate to ascribe any illegal or improper intent to action which has not yet been taken, but it may be helpful to give caution about the potential consequences of that which may be contemplated. The City should carefully consider the need to exercise its authority

by narrowly drawn regulations which do not unnecessarily interfere with First Amendment freedoms, as the Supreme Court has cautioned in *Village of Schaumburg v. Citizens for a Better Environment,* —— U.S. ——, 100 S.Ct. 826, 63 L.Ed.2d 73 (1979).

■■ In summary, the plaintiff has established the need for a preliminary injunction for the protection of its business from irrevocable injury which could occur pending the final resolution of this dispute, under the standards set forth in *Continental Oil Company v. Frontier Refining Co.,* 338 F.2d 780 (10th Cir. 1964). The final outcome of this matter is far from predictable given the difficult questions which I have discussed in this opinion, and given the fact that the Boulder City Council has not yet acted on the applications which have been submitted in the proposal process. While the primary function of a preliminary injunction is to preserve the status quo until a final determination of the rights of the parties, that cannot mean that the parties are frozen in the positions they occupied immediately prior to the filing of the complaint. The circumstances surrounding this case are very fluid and there are interested persons who are not before the court. What equity requires here is that the plaintiff be protected in the exercise of the lawful rights which it had prior to the conduct which in reasonable probability will be declared to be unlawful under the antitrust laws. In considering the public interest and how it may be affected by this injunction, it is necessary to look beyond Boulder to the national policy of protecting free market competition.

If this lawsuit is finally decided in favor of the defendant City of Boulder, any injury which it may sustain can be remedied by the removal of the cables involved in the extension of the plaintiff's plant. It is not necessary to require the posting of a bond in an amount sufficient to cover the cost of that removal because the City already has that protection under the 1964 ordinance.

Accordingly, only a bond to meet the jurisdictional requirements of Rule 65 need be posted, in the nominal amount of $100.00.

Upon the foregoing, it is

ORDERED, that so long as the plaintiff, Community Communications Company, Inc., operates within the terms and conditions of Ordinance No. 2846, enacted October 6, 1964, the City of Boulder and all of its officers, agents, servants, employees, and attorneys are enjoined from taking any unilateral action to restrict, limit, or revoke the authority of the plaintiff to conduct its cable television business in the City of Boulder.