Allen G. CHARLES, M.D., et al.,
Plaintiffs-Appellants,

v.

Bernard CAREY et al.,
Defendants-Appellees.

The HOPE CLINIC FOR WOMEN et al.,
Plaintiffs-Appellants,

v.

William J. SCOTT et al.,
Defendants-Appellees.

Nos. 79–2399, 79–2400.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1980.

Decided July 29, 1980.

As Amended July 31, 1980.

Rehearing and Rehearing In Banc
Denied Oct. 28, 1980.

---

Merle L. Royce, II, Chapman & Royce, Ltd., Chicago, Ill., Frank Susman, Clayton, Mo., for plaintiffs-appellants.

John A. Dienner, III, Asst. State's Atty., Thomas J. Marzen, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, and CUMMINGS and PELL, Circuit Judges.

PELL, Circuit Judge.

These consolidated appeals challenge the district court's denial of a preliminary injunction of certain sections of S.B. 47, the Illinois Abortion Law of 1975, enacted, as amended, on October 30, 1979, over the veto of Illinois Governor Thompson.[1] Some of the plaintiffs are physicians engaged in the practice of obstetrics and gynecology, and some of the plaintiffs are corporations that perform abortion services for women. The complaint seeks declaratory and injunctive relief from the enforcement, operation, and effect of S.B. 47 under 42 U.S.C. § 1983. Some of the defendants are Illinois officials charged with enforcing S.B. 47, and some of the defendants are intervenors. In their complaint, the plaintiffs charged that the Act as a whole is unconstitutional, but the district court rejected this argument and analyzed the constitutionality of the Act on a section-by-section basis, granting a preliminary injunction only as to certain sections.[2] When the district court denied relief, the denial was based either on the plaintiffs' lack of standing or the plaintiffs' failure to show a substantial likelihood of success on the merits. The defendants have not appealed the district court's order and it, of course, continues in effect as to the sections enjoined.

S.B. 47 is a regulatory statute of daedalian complexity defining abortion and prescribing procedures applicable to that operation. On appeal, the plaintiffs have asked us to review the district court's denial of

---

1. According to Governor Thompson's veto message, "[t]his bill . . . imposes a plethora of unreasonable restrictions on the woman's freedom of choice. Its provisions—and, indeed, its intent—represent an attempt to prohibit abortions under the guise of regulation. . . . [T]he bill is so replete with defects that a complete constitutional analysis would fill a treatise. . . ."

We shall refer to the Act as S.B. 47 to avoid confusion with the version of the Illinois Abortion Law of 1975 that was at issue in *Wynn v. Scott*, 449 F.Supp. 1302 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey*, 599 F.2d 193 (7th Cir. 1979).

2. The district court entered a preliminary injunction of the following sections of S.B. 47:

§ 2(2) (defining "viability"); §§ 5(1), (2), (3), §§ 6(1), (4), § 10(i) (incorporating "viability"); § 3.3 (parental consultation); § 3.4 (spousal consultation); § 3.5(2) (only that portion requiring that the patient be told, among other things, that "The State of Illinois wants you to know that in its view the child you are carrying is a living human being whose life should be preserved. Illinois strongly encourages you not to have an abortion but to go through to childbirth. . . ."); § 9 (prohibition of saline amniocentesis); § 10(j) (reporting requirements for amniocentesis); § 10(*l*) (only as to reporting requirements for spousal and parental consent sections); and § 12, (only the sentence prohibiting experimentation with or exploitation of fetal tissue).

the preliminary injunction as to the following sections of S.B. 47:[3] sections 3.2, 3.5, and 6(6), requiring and defining "informed consent," section 3.1, requiring certain consultation procedures, sections 2(6) and 2(10), defining "abortion" and "abortifacient" respectively, section 6(2), making any "human being aborted alive" an "individual" for the purpose of the Illinois Criminal Code, and, finally, sections 7 and 8, establishing procedures for disposition of infants surviving abortions as abandoned children.[4] After addressing preliminary arguments concerning the appropriate standard of review and validity of the Act as a whole, we shall address each challenged section in the order set forth above.

■ To obtain preliminary injunctive relief in the district court, the plaintiffs must demonstrate that there is a reasonable likelihood of success on the merits, that they lack an adequate remedy at law, that irreparable harm to the plaintiffs outweighs any harm to the defendants, and that issuance of the injunction would serve the public interest. *See, e. g., Ekanem v. Health & Hospital Corp.*, 589 F.2d 316, 319 (7th Cir. 1978); *Fox Valley Harvestore v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096, 1097 (7th Cir. 1976). The decision to grant or deny a preliminary injunction is a matter for the discretion of the district court and is reversible, of course, only for an abuse of discretion. It is also well-settled, however, that the application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion. *Benda v. Grand Lodge of the International Association of Machinists*, 584 F.2d 308, 314 (9th Cir. 1978). *See White v. Roughton*, 530

F.2d 750, 754 (7th Cir. 1976); *Airco, Inc. v. Energy Research & Development Administration*, 528 F.2d 1294, 1296 n.1 (7th Cir. 1975); *Milsen Co. v. Southland Corp.*, 454 F.2d 363, 369 (7th Cir. 1971). Similarly, misapplication of the law to particular facts is an abuse of discretion. *Milsen Co. v. Southland Corp., supra*, 454 F.2d at 369 n.9. In either of these circumstances, the denial of the preliminary injunction should be reversed and the injunction entered if necessary to protect the rights of the parties. *White v. Roughton, supra*, 530 F.2d at 754–55; *Milsen Co. v. Southland Corp., supra*, 454 F.2d at 369.

■ The cornerstone of the plaintiffs' argument for reversal is the failure of the district court to apply the proper legal standard in reviewing S.B. 47. According to the plaintiffs, it is the burden of the defendants to show a compelling State interest justifying the regulations in S.B. 47. It is well-settled that a regulation that interferes with the woman's right to decide whether to bear a child must be narrowly drawn to express only the legitimate State interest at stake. *E. g., Roe v. Wade*, 410 U.S. 113, 155–56, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Wynn v. Carey*, 599 F.2d 193, 196 n.6 (7th Cir. 1979); *Wynn v. Carey*, 582 F.2d 1375, 1384 (7th Cir. 1978). Of course, a law is not considered an interference with the pregnancy termination decision and subject to strict scrutiny simply because it concerns abortion. In *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), for example, the Supreme Court applied the rational basis test to a law that merely implemented a State's preference for childbirth over abortion without adding any "restriction on access to abortion that was not already

**3.** Except to the extent that the plaintiffs have offered grounds for enjoining the operation of the Act as a whole, we have limited our review of the denial of a preliminary injunction to those sections specifically addressed in the plaintiffs' brief. Although we are aware of the time restraints upon the plaintiffs in preparing their briefs, the oblique references in their briefs to general dissatisfaction with almost every section of the Act do not provide sufficient grounds for overturning the district court's exercise of discretion in denying the

injunction as to those sections. The plaintiffs would have greatly assisted this court and possibly their cause by providing a listing somewhere in their brief of the provisions of this long and complex law from which they seek relief, including other pertinent incorporated-by-reference statutes.

**4.** The district court ruled that the plaintiffs lacked standing to challenge sections 6(2), 7, and 8, and therefore did not reach the merits of the plaintiffs' arguments.

there." 432 U.S. at 474, 97 S.Ct. at 2383. In applying the rational basis test under those circumstances, however, the Court in *Maher* emphasized that it was not retreating from its holding in *Roe v. Wade*: "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternate activity consonant with legislative policy." *Id.* at 475, 97 S.Ct. at 2383. Thus, to trigger strict scrutiny of S.B. 47, it is the plaintiffs' burden to demonstrate only that it is a "direct interference" with the abortion decision or imposes restrictions that did not already exist. *See also Harris v. McRae,* —— U.S. ——, ——, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); ·*Colautti v. Franklin,* 439 U.S. 379, 386 & n.7, 99 S.Ct. 675, 681 & n.7, 58 L.Ed.2d 596 (1979); *Wynn v. Scott,* 449 F.Supp. 1302, 1307–08 (N.D.Ill.1978), *aff'd sub nom. Wynn v. Carey,* 599 F.2d 193 (7th Cir. 1979).

■ The defendants urge, however, that the plaintiffs must first show an "undue burden" on the abortion decision before the challenged law is subject to strict scrutiny. As support for this argument, the defendants rely on the following language of the Supreme Court:

> In *Planned Parenthood of Central Missouri v. Danforth,* we today struck down a statute that created a parental veto . . . .. At the same time, however, we held that a requirement of written consent on the part of a pregnant adult is not unconstitutional unless it *unduly burdens* the right to seek an abortion.

*Bellotti v. Baird,* 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976) (emphasis added).[5] This argument is refuted by the quoted language itself; the term "undue burden" defines the ultimate constitutional issue, not merely the threshold requirement for strict scrutiny. When describing specifically the burden of the party challenging a state regulation, the Supreme Court has not used the term "undue." *See Harris v. McRae, supra,* —— U.S. at ——, 100 S.Ct.

at 2685 ("if a law 'impinges upon a fundamental right explicitly or implicitly secured by the Constitution [it] is presumptively unconstitutional' "); *Carey v. Population Services International,* 431 U.S. 678, 686, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977) (" 'Compelling' is of course the key word; where a decision as fundamental as that whether to bear or beget a child is involved, regulations *imposing a burden* on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests.") (emphasis added); *id.* at 688, 97 S.Ct. at 2018 ("The significance of [*Roe v. Wade, Doe v. Bolton,* and *Planned Parenthood of Missouri v. Danforth*] is that they establish that the same test must be applied to state regulations that *burden* an individual's right to decide to prevent conception or terminate pregnancy by substantially limiting access to the means of effectuating that decision as is applied to state statutes that prohibit the decision entirely. Both types of regulation 'may·be justified only by a compelling state interest . . and must be narrowly drawn to express only the legitimate state interests at stake.' ") (emphasis added). The threshold question whether there is a "burden" or "direct interference" in the pregnancy termination decision requires the plaintiff merely to show the requisite degree of interference. If the interference is sufficiently substantial and not de minimis, the State has to show the compelling basis for the law, that is, that the burden is not "undue" or unjustifiable. The defendants'· proposed reading of the Supreme Court's language would virtually preclude the application of strict scrutiny to State interference in the abortion decision, for it would require the plaintiff to anticipate—and to rebut—possible reasons for the interference. Only if the plaintiff made this initial showing would the State be called upon to justify its actions. The defendants have suggested no standards by which the courts would determine whether a particular burden is "undue." Presumably the defend-

5. The defendants have also cited a similar passage from *Maher v. Roe, supra,* 432 U.S. at 473, 97 S.Ct. at 2382.

ants would have the courts generally defer to the judgment of the legislative majority that passed the law in determining what is "reasonable." Such deference to the will of the majority would be antithetical to the privacy right at stake, for "[i]t is inherent in the right to make the abortion decision that the right may be exercised . . . in defiance of the contrary opinion of the sovereign and other third parties." *Bellotti v. Baird*, 443 U.S. 622, 655, 99 S.Ct. 3035, 3054, 61 L.Ed.2d 797 (1979) (Opinion of Stevens, J.). *See Whalen v. Roe*, 429 U.S. 589, 599 & n.24, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). The decisions of the Supreme Court do not permit us to substitute what is no more than a standardless reasonableness test urged by the defendants for the well-established requirement that the State justify the impact of a law on this fundamental right by a demonstrable compelling interest. *Carey v. Population Services International, supra*, 431 U.S. at 689–91, 97 S.Ct. at 2018–2019. *See Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 77–79 n.12, 96 S.Ct. 2831, 2844–2845, 49 L.Ed.2d 788 (1976); *Planned Parenthood Ass'n v. Fitzpatrick*, 401 F.Supp. 554, 564 (E.D.Pa. 1975), *aff'd*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976) (burden on State to show: that there exists a legitimate State interest requiring a legislative enactment; the point at which this legitimate State interest becomes compelling; and that the legislative enactment is narrowly drawn to express only the legitimate interest at stake.) [6]

■ To conclude our discussion of the applicable legal principles, we quote the Supreme Court's summary of the State's interests affecting abortion:

[T]he State does have an important and legitimate interest in preserving and protecting the health of the pregnant woman, . . . and it has still *another* important and legitimate interest in protecting the potentiality of human life. The interests are separate and distinct. Each grows in substantiality as the woman approaches term and, at a point during pregnancy, each becomes "compelling."

*Roe v. Wade, supra*, 410 U.S. at 162, 93 S.Ct. at 731. The State's interest in the mother's health becomes "compelling" approximately at the end of the first trimester; the interest in potential life becomes "compelling" at the point of viability. For the stage prior to the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician. *Id.* at 163, 93 S.Ct. at 731.

■ Although S.B. 47 has a severability clause,[7] the plaintiffs have advanced two grounds for enjoining the operation of the Act in its entirety. The first of these grounds is based on the Preamble of the Act.[8] The plaintiffs cite certain language

6. To the extent that *Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542 (D.Me.1979), and *Akron Center for Reproductive Health, Inc. v. Akron*, 479 F.Supp. 1172 (N.D.Ohio 1979), apply the rational basis test in the absence of a showing of an "undue burden" on the woman's privacy rights, we are unpersuaded by the analysis of those opinions. In fact, it is doubtful in light of the Sixth Circuit's more recent decision in *Mahoning Women's Center v. Hunter*, 610 F.2d 456 (6th Cir. 1979), *vacated on other grounds*, —— U.S. ——, 100 S.Ct. 3006, 65 L.Ed.2d 1112 (1980), that *Akron Center* represents the Sixth Circuit rule on this issue.

7. Section 14(1) of the Act provides:
If any provision, word, phrase or clause of this Act or the application thereof to any person or circumstances shall be held invalid, such invalidity shall not affect the provisions, words, phrases, clauses or application of this Act which can be given effect without the invalid provision, word, phrase, clause, or application, and to this end the provisions, words, phrases, and clauses of this Act are declared to be severable.

8. Section 1 of the Act provides:
It is the intention of the General Assembly of the State of Illinois to reasonably regulate abortion in conformance with the decisions of the United States Supreme Court of January 22, 1973. Without in any way restricting the right of privacy of a woman or the right of a woman to an abortion under those decisions, the General Assembly of the State of Illinois do solemnly declare and find in reaffirmation of the longstanding policy of this State, that the unborn child is a human being from the time of conception and is, therefore,

of the preamble as expressing an unlawful legislative purpose to block a woman's path to an abortion:

> . . . [T]he General Assembly of the State of Illinois do solemnly declare and find . . . that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception. . . .

According to the plaintiffs, a statute enacted with such an unlawful purpose must be stricken in its entirety. *See, e. g., Doe v. Rampton,* 366 F.Supp. 189 (D.Utah 1973), *vacated and remanded,* 410 U.S. 950, 35 L.Ed.2d 683. We, however, do not agree with the plaintiffs that the preamble, when read as a whole, expresses an unlawful purpose. The preamble says that

> [I]t is the intention of the General Assembly to reasonably regulate abortion in conformance with the decisions of the United States Supreme Court of January 22, 1973.

On the basis of this language, we agree with the district court in *Wynn v. Scott, supra,* 449 F.Supp. at 1314–15, that the intent of the legislature expressed in the severability clause should control. "[I]f each

> a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and Constitution of this State. Further, the General Assembly finds and declares that long-standing policy of this State to protect the right to life of the unborn child from conception by prohibiting abortion unless necessary to preserve the life of the mother is impermissible only because of the decisions of the United States Supreme Court and that, therefore, if those decisions of the United States Supreme Court are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the former policy of this State to prohibit abortions unless necessary for the preservation of the mother's life shall be reinstated.
>
> It is the further intention of the General Assembly to assure and protect the woman's health and the integrity of the woman's decision whether or not to continue to bear a child, to protect the valid and compelling state interest in the infant and unborn child, to assure the integrity of marital and familial relations and the rights and interests of persons who participate in such relations, and to

provision of the Act in fact impermissibly obstructed a woman's right to an abortion in every case, then each provision would be held unconstitutional apart from the severability clause." *See also Planned Parenthood Ass'n v. Fitzpatrick, supra,* 401 F.Supp. at 564.

■ The plaintiffs' other grounds for striking the entire statute are, first, that it singles out abortion for different treatment from other surgical procedures, and, second, that it regulates first trimester abortions. Both of these grounds for striking abortion legislation have been rejected by the Supreme Court. *Planned Parenthood of Missouri v. Danforth, supra,* 428 U.S. at 66–67, 96 S.Ct. at 2839–2840. *See Wynn v. Scott, supra,* 449 F.Supp. at 1307.[9]

### I. Informed Consent: Sections 3.2, 3.5, and 6(6)

■ Having rejected the plaintiffs' arguments for striking the Act in its entirety, we now turn to a section-by-section review of the statute. The first subject for our discussion, the informed consent regulations, concerns perhaps the most controversial of the provisions before us: sections 3.2, 3.5, and 6(6).[10]

> gather data for establishing criteria for medical decisions. The General Assembly finds as fact, upon hearings and public disclosures, that these rights and interests are not secure in the economic and social context in which abortion is presently performed.

**9.** Although the Supreme Court has rejected the "singling out" of the abortion as a ground in itself for striking abortion regulations; *Planned Parenthood of Missouri v. Danforth, supra,* 428 U.S. at 67, 96 S.Ct. at 2840; it is still one factor to consider in determining whether a particular regulation interferes with the pregnancy termination decision. *Cf. Planned Parenthood Association v. Fitzpatrick, supra,* 401 F.Supp. at 587 (elements of informed consent codified in abortion statute required prior to *any* surgical procedure under state law; informed consent statute upheld).

**10.** We have considered the defendants' argument, which was rejected by the district court, that the plaintiff doctors do not have standing to challenge sections 3.1(B) and 3.2. The gist of the defendants' argument is that the purpose of these informed consent and consultation reg-

Section 3.2 requires the "voluntary and informed" consent of the woman to the ulations is to protect women from abusive medical practices. According to the defendants, to permit doctors to raise the rights of their patients in this circumstance permits (in the defendants' words) "the wolves to guard the flock of sheep." As support for this argument, the defendants cite the opinion of Justice Blackmun in *Singleton v. Wulff*, 428 U.S. 106, 114–15, 96 S.Ct. 2868, 2874–2875, 49 L.Ed.2d 826 (1976).

Although Justice Blackmun's opinion, which represents the views of only four justices, suggests that an *actual* conflict of interests should be a factor in determining, on a case-by-case basis, whether third party standing is appropriate, this case does not present such a conflict. Justice Blackmun considered "two factual elements" to determine whether the assertion of *jus tertii* was appropriate in a challenge by doctors to limits on public funding of their patients' abortions. The first of these is the relationship between the litigant and the party whose rights are at stake. Justice Blackmun noted that "if the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." 428 U.S. at 114–15, 96 S.Ct. at 2874 (Blackmun, J.). The defendants concede that the physician-plaintiffs actually before the court are reputable, responsible, and sincerely concerned for their patients' welfare. These physicians have argued that they cannot properly practice their profession as long as these statutes are in effect. The defendants cannot defeat their standing with the allegation that other physicians are not so concerned with the welfare of their patients. The second factual element suggested by Justice Blackmun is the ability of the third party to assert his or her own rights. Justice Blackmun described the difficulties of women plaintiffs in abortion cases at some length in *Singleton*, 428 U.S. at 117–18, 96 S.Ct. at 2875–2876, and we need not repeat them here. We merely note that the reasoning applies with equal force to this case.

Furthermore, *Singleton* did not concern a statute subjecting the physician to criminal sanctions. The assertion of *jus tertii* appears to be well-settled when the statutes at issue subject the litigant to criminal sanctions. *See Doe v. Bolton, supra*, 410 U.S. 179 at 188–89, 93 S.Ct. 739 at 745–746, 35 L.Ed.2d 201 (1973); *Singleton*, 428 U.S. at 118–19 & n.7, 96 S.Ct. at 2876 (Blackmun, J.).

11. Section 3.2 provides in full:
    Sec. 3.2. Informed Consent. (A) No abortion shall be performed except with the voluntary and informed consent of the woman upon whom the abortion is to be performed.
    (1) Consent to an abortion is voluntary and informed if and only if:

abortion.[11] According to this statute, consent is "informed and voluntary" only if
    (a) The woman is provided, at some time before the abortion, with a true copy of her pregnancy test result by the physician who is to perform the abortion and the woman is provided, at least 24 hours before the abortion, with the following information by the physician who is to perform the abortion:
    (i) The name of the physician who will perform the abortion,
    (ii) The particular medical risks associated with the particular abortion procedure to be employed,
    (iii) The probable gestational age of the fetus at the time the abortion is to be performed, and
    (iv) The printed information prescribed in Section 3.5 of this Law, and
    (b) Prior to submitting to the abortion, but subsequent to receiving the information prescribed by paragraph (A)(1)(a) of Section 3.2, the woman certified in writing that she has received that information from the physician at least 24 hours before the abortion is to be performed, that she understands it, that she consents to the abortion, and that her consent is voluntary and not the result of coercion.
    (B) Exceptions.
    (1) Waiver of waiting period. The requirement of paragraph (A)(1)(a) of Section 3.2 that at least 24 hours elapse between the provision of the information prescribed and the performance of the abortion shall not apply when, in the medical judgment of the attending physician based on the particular facts of the case before him, there exists a medical emergency which warrants nullification of the 24 hour waiting period. In such a case, the physician shall describe the basis of his medical judgment that such an emergency exists on a form prescribed by the Department as required by Section 10 of this Law.
    (2) Limitation of Informed Consent Requirements. Paragraph (A)(1)(a) of Section 3.2 shall not apply when, in the medical judgment of the attending physician based on the particular facts of the case before him, there exists a medical emergency which warrants nullification of the requirements that the woman be provided with the information prescribed by paragraph (A)(1)(a) of Section 3.2 and that the woman certify her consent as prescribed by paragraph (A)(1)(b) of Section 3.2. In such a case, the physician shall describe the basis of his medical judgment that such an emergency exists on a form prescribed by the Department as required by Section 10 of this Law and, if the woman survives the abortion, the physician shall subsequently inform her of the medical indications for his judgment that a medical emergency existed and of the particular medical

certain information is provided to the woman at least 24 hours before the abortion. Furthermore, only the physician who is to perform the abortion may provide this information. To give informed and voluntary consent, the woman must be provided with the following information: a "true copy" of her pregnancy test result,[12] the name of the physician who will perform the abortion, the particular medical risks associated with the abortion procedure to be employed; the probable gestational age of the fetus at the time of the abortion, and printed information provided by the State Department of Public Health under section 3.5.

Section 3.5 [13] requires the Department of Public Health to publish, for distribution under section 3.2, information about agencies available to assist the woman while she is pregnant through to childbirth, and while the child is dependent, including adoption agencies, and how to contact such agencies. Section 3.5 also requires that the Department publish for distribution to the pregnant woman, under section 3.2, materials "designed to inform concerned persons" of the anatomical and physiological characteristics of the fetus "at the various gestational ages at which the abortion might be performed, including any relevant information on the possibility of fetal survival."

To complete the informed consent procedure, a woman is required under section 3.2 to certify, in writing, that she received the required information, that she understands it, that she consents, and that her consent is voluntary and not the result of coercion.

risks associated with the particular abortion procedure employed the symptoms of which might become manifest in the future.

(C) Penalty. Any person who intentionally, knowingly or recklessly violates the requirements of Section 3.2 commits a Class B misdemeanor. Failure to provide the woman with information pursuant to the requirements of Section 3.2 is prima facie evidence of failure to obtain informed consent in appropriate civil actions. The law of this state shall not be construed to preclude award of exemplary damages in any appropriate civil action relevant to violations of Section 3.2. Nothing in Section 3.2 shall be construed to limit the common law rights of the woman to secure informed consent to any form of medical treatment, including abortion.

12. Unlike the other elements of informed consent, which are subject to the 24 hour requirement, the true copy of the pregnancy test need be supplied only "at some time" before the abortion.

13. Prior to the district court's injunction of the italicized portion of this section, 3.5 provided:

Printed Information. The Department shall, within 60 days after Section 3.5 becomes law, cause to be published printed materials that may be easily comprehended in all languages used by significant portions of the population of this State:

(1) Materials designed to inform concerned persons of public and private agencies and services available to assist a woman through pregnancy, upon childbirth and while the child is dependent, including reputable adoption agencies. Such materials shall include a comprehensive list of the agencies available and a description of the manner in which they might be contacted, and

(2) Materials designed to inform concerned persons of the probable anatomical and physiological characteristics of the fetus at the various gestational ages at which abortion might be performed, including any relevant information on the possibility of fetal survival. The following paragraph shall appear at the end of the materials required under this paragraph (2) of Section 3.5:

*The State of Illinois wants you to know that in its view the child you are carrying is a living human being whose life should be preserved. Illinois strongly encourages you not to have an abortion but to go through to childbirth. You are being given a list of agencies and services which can help you to continue the pregnancy, and assist you and your child after your child is born, whether you choose to keep your child or to place her or him for adoption. The State of Illinois strongly encourages you to contact some of them before making a final decision about abortion.*

*The materials required by paragraph 2 of Section 3.5 shall occupy no more than 3 sheets of 8½" by 11" paper, and shall be printed in a typeface large enough to be clearly legible.*

(3) Nothing in Section 3.5 shall be construed to limit the right of the physician or of personnel associated with him to express to the woman their own views concerning the validity or importance of the materials prescribed by Section 3.5. The materials required under Section 3.5 shall be available at no cost from the Department upon request and in appropriate number to any person, facility or hospital.

Section 3.2 also contains an exception to the 24 hour waiting period and informed consent requirements for medical emergencies. Anyone (including the pregnant woman) who "intentionally, knowingly or recklessly" violates the requirements of section 3.2 commits a Class B misdemeanor.

Section 6(6) requires that the physician inform the patient of any reasonable medical certainty of organic pain to the fetus that may result from the particular abortion method to be employed and of available ways to control such pain.[14] Section 6(6) includes criminal penalties for physicians who recklessly, knowingly, or intentionally disregard its requirements.

All of these informed consent regulations are applicable to the first trimester of pregnancy, and we must therefore view them in light of the standards set forth by the Supreme Court in *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). There the Court noted that the abortion decision is a "stressful" one and held that "[t]he woman is the one primarily concerned, and her awareness of the decision and its significance may be assured, constitutionally, by the State to the extent of requiring her prior written consent." 428 U.S. at 67, 96 S.Ct. at 2840. The Court also admonished against attributing more meaning to the term "informed consent" then "the giving of information to the patient as to just what would

be done and as to its consequences," *id.* at 67 n.8, 96 S.Ct. at 2840 n.8 for to do so "might well confine the physician in an undesired and uncomfortable straitjacket in the practice of his profession." *Id.*

■ Citing *Whalen v. Roe*, 429 U.S. 589, 604–05 n.33, 97 S.Ct. 869, 879, 51 L.Ed.2d 64 (1977), the defendants argue that the fundamental right at stake is the *woman's* right to decide whether to bear a child, not the physician's freedom to practice medicine as he chooses; thus the informed consent regulations are not subject to strict scrutiny solely because they burden the physician. Although the defendants' argument correctly identifies the right at stake, it ignores the potential impact of placing "obstacles in the path of the doctor upon whom [the woman is] entitled to rely for advice in connection with her decision." *Id.; Doe v. Bolton, supra,* 410 U.S. at 197–99, 93 S.Ct. at 750–751. *See Colautti v. Franklin,* 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979) ("up to the points where important state interests provide compelling justifications for intervention, 'the abortion decision in all its aspects is inherently, and primarily, a medical decision' "). Thus, a regulation may impose a direct obstacle to the exercise of the woman's fundamental right, and be subject to strict scrutiny, although by its terms it applies only to the attending physician.

14. Section 6(6) provides in full:

(6) When there exists reasonable medical certainty that the particular method of abortion to be employed will cause organic pain to the fetus and there exists reasonable medical certainty that' use of an anesthetic or analgesic which the physician knows to be available would abolish or alleviate organic pain to the fetus caused by the particular method of abortion to be employed, the physician who is to perform the abortion shall inform the woman upon whom the abortion is to be performed that such an anesthetic or analgesic is available for use to abolish or alleviate organic pain caused to the fetus by the particular method of abortion to be employed. Any person who performs an abortion with knowledge that any such reasonable medical certainty exists, or with reckless disregard as to whether any such reasonable medical certainty exists, and intentionally

fails to so inform the woman commits a Class B misdemeanor. Paragraph (6) of Section 6 shall not apply when, in the medical judgment of the physician who is to perform the abortion based upon the particular facts of the case before him, there exists a medical emergency or the administration of such an anesthetic or analgesic would decrease a known possibility of more than momentary survival of the fetus apart from the body of the mother, with or without artificial support. Paragraph (6) of Section 6 shall not apply when the physician who is to perform the abortion administers an anesthetic or an analgesic to the woman to abolish or alleviate pain caused to her by the particular method of abortion employed and he knows there exists reasonable medical certainty that such use will abolish organic pain caused to the fetus during the course of the abortion.

The Supreme Court has ruled on the constitutionality of three "informed consent" abortion statutes. The first of these statutes, upheld in *Danforth*, was general in its terms, requiring only that the woman, "prior to submitting to the abortion, certif[y] in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion." The ruling in *Danforth* is direct authority for upholding the general introductory paragraph of section 3.2(A), which requires "voluntary and informed consent." Similarly, *Danforth* compels us to uphold section 3.2(A)(1)(b), to the extent that it requires consent to be written.

In *Planned Parenthood Association v. Fitzpatrick*, 401 F.Supp. 554 (E.D.Pa.1975), a three-judge district court upheld the informed consent provision in the Pennsylvania Abortion Control Act. This decision was summarily affirmed by the Supreme Court. *Franklin v. Fitzpatrick*, 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). Unlike the statute in *Danforth*, the statute in *Fitzpatrick* set forth certain components of "informed consent":

> (i) that there may be detrimental physical and psychological effects which are not forseeable [sic], (ii) . . . possible alternatives to abortion, including childbirth and adoption, and (iii) . . . the medical procedures to be used.

401 F.Supp. at 583. The district court in *Fitzpatrick* reasoned that "[i]ndisputably, informed consent would be necessary under Pennsylvania law before any medical procedure—including an abortion—may legally be performed. To a considerable extent, the legislature has codified the informed consent requirement [in the challenged statute] and mandates that in the abortion field it be in writing." 401 F.Supp. at 587. Like the plaintiffs in *Fitzpatrick* the plaintiffs here have failed to show, by evidence that abortion has been "singled out" for regulation [15] or other evidence, that the following provisions directly interfere in the woman's abortion decision: section 3.2(A)(1)(a)(i) (requiring the woman to be informed of the name of the physician); section 3.2(A)(1)(a)(ii) (requiring information as to the medical risks of the particular procedure involved); *see Wynn v. Scott, supra*, 449 F.Supp. at 1316–17; and section 3.2(A)(1)(a)(iv) (to the extent that it incorporates the information required under section 3.5(1) pertaining to alternatives to abortion and how to contact various maternal assistance agencies). Although the information required by section 3.5(1) is more detailed than that provided for in *Fitzpatrick*, the substance of the statutes is the same. We fail to see, and the plaintiffs have not shown, how the additional detail alone burdens the woman's decision when general information on the alternatives does not.

The Eighth Circuit struck down an "informed consent" regulation in *Freiman v. Ashcroft*, 584 F.2d 247 (8th Cir. 1978), and the Supreme Court summarily affirmed this decision, 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979). At issue in *Freiman* was the validity of a requirement that the physician inform his patient that, in the event a live-born infant results from an attempted abortion, parental rights would be terminated. The requirement applied to all trimesters. The Eighth Circuit held:

> The result of a physician's warning would be to inject into the decision-making process between physician and patient a factor which is irrelevant and extraneous to the medical services being rendered. Section 188.045's imposition upon the physician to inform his patient of section 188.040 is a violation of the equal protection clause of the Fourteenth Amendment inasmuch as it singles out the abortion operation for this "straitjacket" requirement. It is a violation of the due process clause because of the invasion into the delicate and private physician-patient relationship. Requiring the physician to relate section 188.040 interferes with the woman's right to consult with her physician concerning her decision of

15. *See* note 9 *supra*.

abortion without undue restriction by the state.

584 F.2d at 251–52.

The plaintiffs argue and we agree that certain of the "informed consent" components of section 3.2 constitute such an unconstitutional "straitjacket" on the physician's ability to counsel with his patient with her best medical interests—both physical and psychological—in mind. In *Danforth* the Supreme Court emphasized that informed consent was permissible to counteract the stressfulness of the abortion decision. 428 U.S. at 67, 96 S.Ct. at 2840. Sections 3.2(A)(1)(a)(iii), and 3.2(A)(1)(a)(iv) (to the extent that it incorporates the informational materials required by section 3.5(2)) requires the woman, under threat of criminal penalty, to be told by her physician the gestational age of the fetus and to view materials produced by the State showing probable anatomical and physiological features of the fetus at various gestational ages. The statute exacts this of the woman seeking an abortion regardless of her physical and mental health, or the relevance of the information to her decision. The prospect of such "required reading" for the woman who elects to abort a fetus because of serious genetic defects or because her own health is in danger is punitive to the woman and compromising to the physician's efforts to do what is best for her. The defendants have offered no compelling justification for these requirements.

For the same reasons, section 6(6) is a direct burden on the abortion decision. This section, which also applies regardless of the stage of pregnancy, requires the physician to inform the pregnant woman of the possibility of "organic pain" to the fetus when there exists a "reasonable medical certainty" that the particular method of abortion to be used will cause such pain, and of available methods of alleviating or abolishing such pain. Intentional failure to provide this information subjects the physician to criminal penalties. The uncontroverted medical testimony in the record at this stage describes this information as "medically meaningless, confusing, medical-

ly unjustified, and contraindicated, causing cruel and harmful stress to . . . patients." The defendants have submitted no evidence to rebut the plaintiffs' characterization of this information as false and unwarranted. Even assuming, therefore, that the State may further at all stages of pregnancy its asserted interest in "humane disposition of the fetus," a question we do not decide, the record now before us indicates that this particular informational requirement furthers no such purpose.

In addition to covering the substance of informed consent, section 3.2 contains certain procedural requirements, which are also enforced by criminal sanctions. These requirements appear in section 3.2(A)(1)(a).

We turn first to the requirement that the physician who actually performs the abortion conduct the informed consent consultation, which includes providing the patient with a "true copy" of her pregnancy test. The burdensomeness of this requirement is evident. A woman may well consult in the first instance with her personal physician in reaching her decision. Under this "same doctor" rule, if that physician refers the woman to another doctor for the actual abortion operation, the woman will nevertheless have to undergo the expense and inconvenience of another pregnancy test and informed consent procedure. The defendants have attempted to justify this burdensome requirement as if it were merely a requirement that the woman consult a physician (as opposed to a nurse or other counselor) in making her informed consent, a question we need not decide. The defendants have offered no justification at all, however, for the actual statutory requirement that the informed consent procedure and the operation be performed by the same physician. In the absence of any justification for this burdensome procedure, the plaintiffs are entitled to a preliminary injunction. *See Doe v. Bolton, supra,* 410 U.S. at 179, 93 S.Ct. at 750 (hospital committee approval of abortion "redundant"; state's interests protected by physician-patient interview; "[t]he woman's right to receive medical care in accordance with her

licensed physician's right to administer it are substantially limited by this statutorily imposed overview").[16]

We turn next to the 24 hour mandatory waiting period between the consultation and the operation of section 3.2(A)(1)(a). We have already held that a 48 hour waiting period applicable to minors' first-trimester abortions "clearly affects a minor's fundamental privacy right to decide to terminate her pregnancy . . . " and that " . . . strict scrutiny is the proper level of review . . . " in such a case. *Wynn v. Carey*, 599 F.2d 193, 196 n.6 (7th Cir. 1979).[17] The 24 hour mandatory waiting period imposes burdens of the same nature as the 48 hour period, that is, delay attended by increased risk as the pregnancy progresses, especially for working women or women who must travel far, either arranging for overnight accommodations or making two trips. Thus, considered in light of other practical limitations on women's access to abortions, *see Danforth, supra*, 428 U.S. at 75–79, 96 S.Ct. at 2843–2846 (prohibition of saline amniocentesis in the second trimester on the basis of deleteriousness to mother's health is unconstitutional; although an alternative method that is perhaps safer exists, it is not generally available in this country), the 24 hour mandatory waiting period produces in many cases a substantially longer delay. The State's burden is therefore to justify this obstacle as narrowly drawn to further a compelling interest.[18]

The defendants have argued that the State has a "compelling interest" in "assuring the integrity of the woman's decision." Certainly the State has such an interest in assuring that the woman has consented to the abortion procedure. *See Danforth, supra*, 428 U.S. at 67, 96 S.Ct. at 2840. Furthermore, the defendants have asserted (with little evidence in the record) that women contemplating abortion are subjected to coercion by unscrupulous doctors, and that the 24 hour waiting period protects women from this pressure. Perhaps the 24 hour delay would eliminate the effect of abusive medical practices in some instances. The majority of women, however, are under the care of able and conscientious physicians who would ensure their understanding and consent to the procedure, and these women will be subject to the inconvenience, expense, and additional anguish attending this rigid requirement. The Supreme Court anticipated State efforts to use their power to regulate the medical profession as the apparent basis for what is in effect a regulation of the woman's abortion decision when it said in *Doe v. Bolton*:

> The [Georgia abortion] statute's emphasis . . . is on the attending physician's "best clinical judgment that an abortion is necessary." That should be sufficient. The reasons for the presence of the [two-doctor confirmation rule] in the statute are perhaps apparent, but they are insuf-

16. The defendants cite in support of the statute the decision of the district court in *Akron Center for Reproductive Health, Inc. v. City of Akron*, 479 F.Supp. 1172 (N.D.Ohio 1979). In *Akron Center* the statute required that certain information be imparted by the "attending physician." It is not clear from the opinion that the statute actually set forth a "same doctor" requirement, and the opinion clearly bases its reasoning on the State's interest in having a physician, as opposed to another type of counselor, consult with the patient. Furthermore, *Akron Center* is unpersuasive because it quite clearly applies the defendants' proposed "undue burden" analysis, which we have rejected, *supra*, and appears to concede that the requirement could not survive strict scrutiny.

17. Citing Justice Powell's opinion in *Bellotti v. Baird*, 443 U.S. 622, 639–40, 99 S.Ct. 3035, 3046–3047, 61 L.Ed.2d 797 (1979), the defend-

ants have urged that we treat requirements such as the waiting period, that do not impose an absolute veto on the abortion as "fundamentally different" with respect to constitutional analysis. We do not think that this reference in *Bellotti*, which was not the opinion of a majority of the justices and which concerned the specialized area of parental consent to a minor's abortion, affects the applicability of the *Wynn* standard to the waiting period before us, which is applicable to women of all ages.

18. The defendants once again cite as support the decision of the district court in *Akron Center for Reproductive Health, Inc. v. City of Akron, supra*, in which the court failed to require a compelling State interest for the mandatory 24 hour waiting period, and which is, for that reason, not persuasive.

ficient to withstand constitutional challenge. Again, no other voluntary medical or surgical procedure for which Georgia requires confirmation by two other physicians has been cited to us. If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. 410 U.S. at 199, 93 S.Ct. at 751. The State has not shown that the mandatory 24 hour waiting period is narrowly drawn to meet the interest asserted. The language of section 3.2(A)(1)(a) setting forth that requirement therefore cannot stand.[19]

Finally, we turn to the requirement of section 3.2(A)(1)(a) that the woman be provided "at some time before the abortion, with a true copy of her pregnancy test result by the physician who is to perform the abortion." This portion of the statute contains a "same doctor" rule [20] and, for the reasons discussed above in the context of the informed consent requirements, must fail.[21] The language requiring that a woman receive a "true copy of her pregnancy test results" apparently contemplates a laboratory test for diagnosis of pregnancy, although the requirement applies to later stages of pregnancy as well, when such a test is ordinarily unnecessary for accurate diagnosis of pregnancy. The defendants attempt to justify this burdensome requirement as ensuring that fraudulent abortions are not performed on nonpregnant women. We question whether this requirement would have any deterrent effect on the small minority of unscrupulous physicians who would engage in such a fraud. On the other hand, this requirement is certainly a regulatory trap for the unwary designed to further a state interest already protected by section 11(f) of S.B. 47, which punishes performance of an abortion on a nonpregnant woman as a felony, and leaves the physician subject to other "judicial and intraprofessional remedies." *See Roe v. Wade, supra,* 410 U.S. at 166, 93 S.Ct. at 733. This requirement of a "true copy of the pregnancy test result" must be enjoined.

## II. *Consultation and Diagnosis: Section 3.1*

The plaintiffs challenge section 3.1 on the basis of its repeated references to the physician's determination that "in his best clinical judgment the abortion is necessary." [22] According to the plaintiffs, the

---

**19.** Section 3.2(B)(1), relating to waiver of the period, and section 10(k), establishing reporting requirements in case of waiver of the period, accordingly must also be enjoined.

Furthermore, in light of our holding on the "same doctor" rule and the 24 hour rule, the portion of section 3.2(A)(1)(b) requiring the woman to certify in writing her compliance with these requirements must also be enjoined.

**20.** Even women whose original consultation with a doctor included a pregnancy test but resulted in a referral must have the performing doctor again present her with the results of her pregnancy test.

**21.** The plaintiffs have argued that the statute requires the doctor who will perform the abortion actually to make the pregnancy test. The language of the statute contains no such requirement. It merely requires the performing physician to provide the woman with the results. Thus, although the statute does not in effect require two pregnancy tests for referral patients, it does at least require forwarding of such a "true copy" from physician to physician for resubmission to the patient by the performing physician. The defendants have offered no justification for requiring doctors to follow, under threat of criminal liability, this rigid procedure.

**22.** Section 3.1(A) requires this diagnosis, under criminal penalty, as a prerequisite to performing an abortion:

Sec. 3.1(A) Medical Judgment. No abortion shall be performed except by a physician after he determines that, in his best clinical judgment, the abortion is necessary. Any person who intentionally or knowingly performs an abortion contrary to the requirements of this paragraph (A) commits a Class 2 felony.

Section 3.1(B)(1)(a) requires a consultation sufficient to make this determination:

(1) No abortion shall be performed except in compliance with regulations which the Department shall issue to assure:

(a) That, before the abortion is performed, the woman upon whom the abortion is to be performed will have a private medical consultation with the physician who is to perform the abortion; that the consultation will

use of this standard renders section 3.1 unconstitutionally vague. The plaintiffs concede that the language in question is exactly the same as that upheld against a charge of vagueness in *Doe v. Bolton*. In that decision the Supreme Court held:

> We agree with the District Court . . . that the medical judgment [of necessity] may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health.

410 U.S. at 192, 93 S.Ct. at 747. The plaintiffs nevertheless urge that the term "clinical judgment that the abortion is necessary," upheld in *Bolton*, has lost its meaning in the aftermath of decisions such as *Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); and *Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977), which established in the context of restrictions on public funding of abortions, a legally significant difference between "medically necessary" and "elective" abortions, "medically necessary" designating only one category of abortions permissible under *Roe v. Wade*. According to the plaintiffs, these subsequent developments make it unclear whether the statute forbids "elective" abortions. We disagree.

The terms "medically necessary" and "best clinical judgment that the abortion is necessary" have consistently described separate concepts in the case law. To successfully challenge this statute for vagueness, the plaintiffs would have to argue that the terms somehow had merged in meaning. The recent decision of the Supreme Court in *Colautti v. Franklin* reaffirming the holding in *Doe v. Bolton*, however, refutes the plaintiffs' argument. *See* 439 U.S. at 393–94, 99 S.Ct. at 685. ("Because of the double ambiguity of the viability-determination requirement, this portion of the Pennsylvania statute is readily distinguishable from the requirement . . . that a physician determine, on the basis of his 'best clinical judgment,' that an abortion is 'necessary' . . . .") We therefore hold that the district court did not abuse its discretion in refusing to grant the preliminary injunction of section 3.1.[23]

### III. *The Definition of "Abortion": Section 2(6)*

The plaintiffs argue that the district court should have stricken section 2(6) defining "abortion" as void for vagueness. Although the plaintiffs have shown that the effect of the definition is perhaps to provide less protection to the fetus than the State may have intended, we are not convinced that the existence of a "loophole" renders

be in a place, at a time and of a duration reasonably sufficient to enable the physician to determine whether, based upon his best clinical judgment, the abortion is necessary;

Finally, section 3.1(B)(1)(b) requires reporting to the State the basis for this diagnosis:

(b) That the physician who is to perform the abortion will describe the basis of his best clinical judgment that the abortion is necessary on a form prescribed by the Department as required by Section 10 of this Law.

Violations of section 3.1(B) are punishable as Class A misdemeanors. § 3.1(B)(3).

23. Although section 3.1(B)(1)(a) contains the requirement that a "medical necessity" consultation be made by the "physician who is to perform the abortion," the plaintiffs have not challenged it as a burdensome "same doctor" requirement, possibly entailing repetitious, costly, and inconvenient procedures for referral patients. Of course the State may require that the necessity determination be made by a physician, *see Roe v. Wade, supra*, but we question whether this determination need be made anew by the physician who performs the abortion if the patient has already consulted with one physician. *See Doe v. Bolton, supra* (two-doctor concurrence rule unconstitutional).

We do note that the terms of section 3.1(B)(1)(a) subject the form of consultation by the physician who is to perform the abortion to a standard of reasonable sufficiency, so that it perhaps is less rigid and burdensome than the informed consent "same doctor" requirements considered *supra*. This "reasonableness" limitation, however, applies only to "time," "place," and "duration," so that the flexibility afforded to physicians may be less than it appears.

In any event, the preliminary record before us provides no guidance on the effect, if any, of this requirement on the physician-patient relationship. An injunction is therefore not in order, although further development in the record on remand may change this result.

the statute unconstitutionally vague. We agree with the district court that the new definition cures the fatal defects of the definition of "criminal abortion" stricken in *Wynn v. Scott, supra,* 449 F.Supp. at 1328–30.

Section 2(6) defines "abortion" as follows: "Abortion" means the use of any instrument, medicine, drug or any other substance or device to terminate the pregnancy of a woman known to be pregnant with intent to cause fetal death.

In *Wynn v. Scott,* the definition of "abortion" centered on the terms "with intent to procure a miscarriage."[24] The vagueness in the statute was primarily the result of the use of the term "miscarriage," which was undefined. Application of definitions of this term suggested by the State produced results totally at odds with the professed purpose of the statute. One of the proposed definitions, for·example, resulted in stricter regulation of abortions performed prior to viability than those performed after viability. Another definition produced the anomalous result of leaving a physician unsure until after the fact whether he attended at an abortion or a delivery. The district court concluded:

[t]he vagueness lurking in [the] definition . . . is more than a verbal conundrum. It highlights the point that the distinction between abortion and delivery is one of intent.

449 F.Supp. at 1329. Citing various constitutional definitions of "abortion" from other states, the court noted that "[a]ll these definitions clearly describe the mental state which distinguishes a late-term abortion

from a delivery or attempted delivery." *Id.* at 1330.

Although the definition in section 2(6) now contains a mental state ("intent to cause fetal death") that makes this distinction, the plaintiffs nevertheless argue that it is still unconstitutionally vague. The gist of the plaintiffs' argument is that the use of the term "abortion" in other provisions produces results inconsistent with the purpose of the Act. Unlike the plaintiffs in *Wynn,* however, the plaintiffs have not pointed to any particular term or terms (although the use of the term "death" in conjunction with the term "fetal" may present problems not briefed here) so devoid of meaning that reasonable persons are deprived the opportunity to conform their conduct to the law. *See Colautti v. Franklin, supra.* Furthermore, we are not convinced that the application of the term produces results so aberrational or confusing that compliance with the law is unreasonably difficult.

According to the plaintiffs, the "loophole" created by the new definition arises when its "intent to cause fetal death" provision is read into other sections of the Act relevant to post-viability pregnancy terminations. The plaintiffs argue that the State has accorded less protection to viable fetuses when the pregnancy is terminated without the intent to cause fetal death than when there is such an intent and that this scheme is inconsistent with the expression of legislative intent to assert the State's compelling interest in preserving the post-viable fetus expressed in section 5(2)[25] of S.B. 47. Specifically, the plaintiffs point to section 4,[26] which requires life support measures for

---

**24.** In the 1975 Act at issue in *Wynn v. Scott,* "criminal abortion" was defined as follows:

the use of any instrument, medicine, drug, or other substance, whatever, with the intent to procure a miscarriage of any woman except when done by a physician in conformity with this Act.

**25.** Section 5(2) provides in part:

When the fetus is viable no abortion shall be performed unless medically necessary to preserve the life or health of the mother. The district court enjoined this section because of its use of "viability" but we nevertheless

judge the definition of "abortion" in light of the entire Act.

**26.** Section 4 provides in part:

No abortion performed subsequent to the first trimester shall be performed except in a hospital, on an inpatient basis, with measures for life support for the fetus which must be available and utilized, if there is any clearly visible evidence of viability.

Section 4 was also enjoined by the district court.

fetuses when abortions are performed after the first trimester, and sections 7 and 8 deeming fetuses surviving abortions to be abandoned.[27] The defendants argue persuasively, however, that when a pregnancy termination is performed without the intent to cause fetal death, less regulation on behalf of the fetus is necessary[28] to preserve the State's interest in the fetus. Of course, the State could expand the field of regulation by defining the intent element more broadly, for example, "with intent other than to produce a live birth or to remove a dead fetus," *see Wynn v. Scott, supra,* 449 F.Supp. at 1330, but we do not see why maximum regulation should be constitutionally compelled.

IV. *The Definition of "Abortifacient": Section 2(10)*

The plaintiffs also challenge the definition in section 2(10) of the term "abortifacient" as overbroad and, in light of sections 11(d) and 11(f) of S.B. 47, infringing impermissibly on the right to birth control. *See Carey v. Population Services International, Inc., supra*; *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). Section 2(10) defines "abortifacient" as follows:

"Abortifacient" means any instrument, medicine, drug, or any other substance or device which is known to cause fetal death when employed in the usual and customary use for which it is manufac-

tured, whether or not the fetus is known to exist when such substance or device is employed.

Because "fetus" is defined very broadly in section 2(9) to mean "a human being from fertilization until birth," the term "abortifacient" incorporates the IUD, a common form of birth control, which functions by preventing implantation of the fertilized egg. The effect of this broad definition is evident in section 11(d) of the Act,[29] which requires anyone prescribing abortifacients to advise the patient that the device is an "abortifacient." The plaintiffs have submitted affidavits that this requirement is confusing and needlessly painful to patients receiving certain kinds of birth control. We agree with the plaintiffs that section 2(10) infringes on the fundamental right to birth control. It is not, as the defendants urge, justifiable as a "truth-in-labeling" regulation. Such regulations may be permissible, but use of the term "abortifacient" in describing certain birth control methods forces the physician to act as the mouthpiece for the State's theory of life. In this way, section 11(d) is merely a milder version of the "informed consent" provision of section 3.5(2), enjoined by the district court, requiring, among other things, that the patient be told that "[t]he State . . . wants you to know that in its view the child you are carrying is a living human being . . . .."[30] The plaintiffs are entitled to a

---

27. We do not consider section 6(1), which was mentioned in the plaintiffs' brief, to be applicable to the plaintiffs' argument because, in setting forth the standard of care due to the fetus, it refers to "pregnancy terminations," not "abortion."

28. In considering the validity of section 2(6) in the context of sections 7 and 8, we express no view on the validity of those abandonment provisions, a question which is not before us. See pt. VI, *infra.*

29. Section 11(d) provides:
   Any person who sells any drug, medicine, instrument, or other substance which he knows to be an abortifacient and which is in fact an abortifacient, unless upon prescription of a physician, is guilty of a Class B misdemeanor. Any person who prescribes or administers any instrument, medicine, drug or other substance or device, which he

knows to be an abortifacient, and intentionally, knowingly, or recklessly fails to inform the person for whom it is prescribed or upon whom it is administered that it is an abortifacient commits a Class C misdemeanor.

30. We decline to strike section 11(f) on the basis of our ruling on the term "abortifacient" because section 11(f) does not even employ that term. Section 11(f) provides:
   Any person who intentionally, knowingly, or recklessly performs an abortion procedure upon a woman who is not pregnant commits a Class 2 felony.
   Although section 11(f) apparently is directed at the valid goal of stopping fraudulent abortions, the term "abortion procedure" is undefined, and in light of the confusion caused by the definitions of "abortion" and "abortifacient" may be unconstitutionally vague. The plaintiffs have only challenged section 2(10) in

preliminary injunction as to sections 2(10) and 11(d).

## V. *The Homicide Provision: Section 6(2)*

■ Section 6(2) of S.B. 47 provides:

The law of this State shall not be construed to imply that any human being aborted alive is not an individual under the "Criminal Code of 1961," approved July 28, 1961, as amended.

The district court held that the plaintiffs had no standing to challenge this section and accordingly did not reach the merits of the plaintiffs' challenge to the section for vagueness. In reaching this conclusion, the district court reasoned that "this section places no obligation upon plaintiffs or their pregnant patients. . . ." It is true that this section does not expressly mention criminal or civil penalties. This section, however, despite its peculiar phrasing, is quite clearly an attempt, by means of a definitional amendment, to subject certain conduct to punishment under the homicide provisions of the Illinois criminal laws. "Murder" is defined by the Illinois Criminal Code as follows:

A person who kills an individual without lawful justification commits murder if, in performing acts which cause the death [he acts with certain mental states.]

Ill.Rev.Stat. ch. 38, § 9–1. By expanding the definition of "individual," [31] section 6(2) subjects physicians to possible criminal penalties, and the physician plaintiffs have therefore demonstrated sufficient injury to raise their constitutional challenge.

■ The plaintiffs argue, and we agree that the challenged section is void for vagueness and should be enjoined.[32] The term "human being aborted alive" is without definition in the Act, yet, under section 9–1 of chapter 38, performing acts which cause the death of such an individual could subject the physician to prosecution for murder. In *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979), the Supreme Court reiterated the settled doctrine that a statute is void for vagueness if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute or is so indefinite that it encourages arbitrary and erratic convictions. 439 U.S. at 390, 99 S.Ct. at 683. The Court added that "[t]his appears to be especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 391, 99 S.Ct. at 683. Viewed in light of *Colautti*, this statute must be enjoined.

As interpreted by the Illinois Supreme Court, section 9–1, as amended by section

---

this court, however, so further consideration of section 11(f) must await remand.

**31.** The defendants argue that the definition of "individual" has always included a "human being aborted alive." According to the defendants, the striking of the law will have no effect on the Illinois law, apparently seeking to defeat standing under the rationale of *Warth v. Seldin*, 422 U.S. 490, 502–08, 95 S.Ct. 2197, 2207–2210, 45 L.Ed.2d 343 (1975) (to have standing, the plaintiff must allege facts demonstrating that he personally will benefit from the court's ruling). We express no view whether the defendants' argument properly applies this "cause in fact" requirement of *Warth* to these circumstances, because the recent decision of the Illinois Supreme Court in *People v. Greer*, 79 Ill.2d 103, 37 Ill.Dec. 313, 402 N.E.2d 203 (1980), indicates that the defendants' assertion as to the historically broad applicability of the murder statute to fetuses is utterly without merit, and that section 6(2) of S.B. 47 did indeed broaden the scope of that statute.

**32.** The defendants argue that because the district court did not reach the merits of section 6(2), in the event of reversal on this issue, we should remand for consideration of the merits for the first time in the district court. The determination of what questions will be considered and resolved for the first time on appeal, however, is left to the discretion of the court of appeals. *Singleton v. Wulff, supra*, 428 U.S. at 120–21, 96 S.Ct. at 2877; *Wagner v. United States*, 573 F.2d 447 (7th Cir. 1978); and we have decided to reach the merits. Because both parties have argued the merits of the preliminary injunction of these sections in the district court and in this court, the defendants cannot show undue surprise or prejudice on appeal if we consider these issues. *Cf. Singleton v. Wulff, supra* (issue of standing raised on motion to dismiss; no other pleading addressed merits). Because of the thorough treatment of the issue, we see no reason to delay further consideration of the preliminary injunction of section 6(2).

6(2), applies only to fetuses that are "born alive and subsequently expire." *People v. Greer*, 79 Ill.2d 103, 37 Ill.Dec. 313, 402 N.E.2d 203 (1980).[33] The decision in *Greer*, however, does not remedy the fundamental vagueness problem of the statute. The issue in *Greer* was whether causing the death of an 8½ month, unborn fetus was covered by the murder statute. The court held the murder statute inapplicable. Nothing in the *Greer* opinion, however, assists us in determining the meaning of "aborted alive." The meaning of the term "alive" could include only the most minimal of life signs in a nonviable fetus or it could be limited to the capability of sustained survival. The lack of a precise definition leaves physicians uninformed as to their duties toward the fetus and could deter them from performing abortions for fear of being singled out for prosecution for murder under this ambiguous standard. In reaching our decision, we do not imply any limitation or expansion of the State's power to punish particular conduct toward the fetus. That question is not presented by the vagueness challenge to the statute.

VI. *Abandonment of Infants Surviving Abortions: Sections 7 & 8*

▊ The plaintiffs finally challenge sections 7 and 8, which establish a scheme for disposition of infants that survive abortions.[34] The plaintiffs have based their standing to challenge both sections on the requirement of section 7 that they report, under threat of criminal penalty, these births to the Juvenile Court. The district court held, and we agree that this requirement is inadequate to confer standing on the physician plaintiffs.

In *Danforth*, the Supreme Court was confronted with a similar "abandonment" statute, which required physicians to notify the juvenile court of the existence of a live born infant. 428 U.S. at 86, 96 S.Ct. at 2848. The Court held that the physician plaintiffs "do not claim any interest in the question of who receives custody that is 'sufficiently concrete' to satisfy the 'case or controversy' requirement of a federal court's Art. III jurisdiction." *Id.* at 62 n.2, 96 S.Ct. at 2838 n.2. The plaintiffs' attempt to transform the duties imposed by the reporting requirement into the required interest in the custody of the infant does not successfully distinguish the ruling of the Court on this issue. *See also Freiman v. Ashcroft*, 584 F.2d 247, 249–50 (8th Cir. 1978), *aff'd*, 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979); [35] *Wynn v. Scott, supra*, 449 F.Supp. at 1309 n.2.

---

**33.** In the absence of this interpretation by the Illinois Supreme Court, section 6(2) could have had a far more inhibitory effect on the exercise of fundamental rights. The broad definition of "human being" as including "the individual from fertilization until death," and the indications in sections 1 and 3.5(2) that fetuses are to be considered "living" human beings could potentially have rendered *all* pregnancy terminations subject to prosecution for the murder of "human beings aborted alive."

**34.** Section 7 provides:

In every case in which any infant is born alive as the result of a voluntary abortion, the physician who has performed the abortion shall notify the Juvenile Court that such an infant has been born. When such an infant has been born alive in a hospital or licensed facility, the hospital or facility shall also notify the Juvenile Court of the birth of the infant. Upon notice of the birth of such an infant, the Juvenile Court shall initiate any proceedings and determinations which are appropriate under the provisions of Section 8 of this Law. During the course of such proceedings and determinations, the Juvenile Court shall not disclose the identity of the mother of any such infant except to the extent disclosure is necessary to secure the rights or interests of the infant, the infant's father, or the State.

Section 8 provides:

Upon a finding by the Juvenile Court that a live born infant has resulted from a voluntary abortion, such an infant has been abandoned pursuant to the procedures and provisions of the "Juvenile Court Act," approved August 5, 1965, as amended, and "An Act in relation to the adoption of persons, and to repeal an Act therein named," approved July 17, 1959, as amended. Such an infant, prior and subsequent to birth, is a minor and a child pursuant to the procedures and provisions of said Acts.

**35.** As support for their position on the merits of this statute, the plaintiffs quote Judge Webster's comment in the district court opinion on the Missouri abandonment provision at issue in *Freiman*:

## VII. *Conclusion*

For convenience, a summary of our rulings has been set forth in the margin.[36] We emphasize that our action, being on the basis of the record before us, does not preclude further development of the record by both parties on remand. Accordingly, the order of the district court is affirmed in part, reversed in part, and remanded with directions.

---

[The termination of parental rights provision] is perhaps the most offensive of the *in terrorem* clauses that were enacted by the Missouri legislature . . . because it reflects a legislative conclusion that a woman who asserts her constitutional right to an abortion has thereby become unfit for parenthood if the child is somehow born alive. . . . This patently unconstitutional appendage [is] totally lacking in due process . . . .

440 F.Supp. 1193, 1195.

Although we express no opinion of the merits of the Illinois scheme, we voice our agreement with Judge Webster's conclusion in *Freiman*:

It is regrettable that a Jane Doe does not come forward so that this question may be squarely addressed.

*Id.* at 1195.

36. The district court is directed on remand to enter a preliminary injunction as to the following:

§ 3.2(A)(1)(a)(iii); § 3.5(2); § 6(6); § 3.2(A)(1)(a) (the terms "by the physician who is to perform the abortion"); § 3.2(A)(1)(a) (the terms "and the woman is provided at least 24 hours before the abortion"); § 3.2(A)(1)(b) (the terms "from the physician at least 24 hours before the abortion is to be performed"); § 3.2(B)(1) (waiver of waiting period); § 10(k) (reporting requirement for waiver of the waiting period); § 3.2(A)(1)(a) (the terms "with a true copy of her pregnancy test results"); § 2(10); § 11(d); § 6(2).